# LOUIS A. STROTHER et al. v. FRANKLIN M. BARROW, Appellant.

### Division One, November 30, 1912.

1. **CHARITABLE USE: Religious Purposes.** Property deeded to the trustees of a church to be used and occupied "for the worship of God" is devoted to a charitable use, and a pious use as well. The law favors a charitable use, and the idea of perpetuity is of the very essence of such a grant.

2. ———: ———: **Abandonment: Necessary Elements.** Abandonment of a pious use involves two elements: first, the intent to abandon permanently; and, second, the physical fact of nonuser for religious purposes. They must conjoin and both must be operative at the same time, or there can be no abandonment. And the fact that religious services at times languished, or were discontinued for short periods and were then resumed, does not establish either intent to abandon or nonuser. Nor does the fact that defendant made a garden of the churchyard for a season or two and stored his potatoes in the church house. Nor does the fact that one denomination sold the property to another and moved its Bible, organ, pulpit, bell and pews to another edifice, and in its deed declared that "said premises were conveyed in trust and shall be used, kept and maintained and disposed of as a place for divine worship," indicate an abandonment, either by intention or nonuser. The law looks with disfavor upon the abandonment of a pious or charitable use.

3. ———: ———: ———: **Limitations.** There being no abandonment of the charitable use or religious purpose to which the property had been originally granted, an intermittent adverse possession for eighteen years will not avail defendant, since the statute (Sec. 1886, R. S. 1909) declares that "nothing contained in any Statute of Limitations shall extend to lands given, granted, sequestered or appropriated to any public, pious or charitable use."

4. ———: ———: ———: **Taken over by Another.** Property granted to the trustees of one denomination for religious uses is not required to be used forever by that congregation or lose its character of a pious use. It is not an abandonment of a pious use to have one religious denomination take over by purchase the church edifice of another. Property granted to one Chris-

246 Mo.—16

tian church for its religious uses may be transferred to another by sale without constituting a break in the pious or charitable use.

5. ———: ———: ———: Who May Raise the Question. In this case it is assumed, but not decided, but questionably allowed, that a defendant in ejectment, who is a stranger to plaintiffs' chain of title, may raise the point of the abandonment of a charitable or pious use in aid of his claim by adverse possession and limitations.

6. ———: Break: Deed from Presbyterians to New York Corporation. There was no break in the pious use to which the property had been devoted by the deed to the Presbyterians, by a deed from them to "The Universalist General Convention, a corporation existing under the laws of the State of New York." Though the deed is silent on the business character of that corporation and there is no reference in it whereby it can be seen on its face that it was a grant to a religious use, except the one word "Universalist," yet since the proof is that the Universalist denomination did use the property for religious purposes after this deed was made, and that this convention, when it conveyed to the Methodist trustees, described itself as a religious corporation, and there is no countervailing testimony, the holding will be that this corporation was an instrumentality of the Universalist church for holding property, that it was seized of the title for the use of the Universalist denomination, and that the pious use was not broken by the deed to it.

7. CONVEYANCE: Acknowledgment: By Corporation: Sufficiency. A certificate of acknowledgment to a deed may be good though it does not conform to the form given in the statute. That statute is not mandatory, but permissive, and the statutory form is not necessary to a good acknowledgment. Where the corporation's seal is attached to the deed and it is signed by the proper officers of the company, a certificate of acknowledgment stating those facts, though it does not state that they were authorized by the board of directors to execute the deed, is prima facie sufficient, and it devolves on the person assailing the deed to show that they did not have authority to execute it.

Appeal from Pike Circuit Court.—*Hon. David H. Eby,* Judge.

AFFIRMED.

*J. O. Barrow* and *Hostetter & Haley* for appellant.

(1) Where a common source of title was admitted or proven, then adverse possession will con-

stitute a defense. Emstring v. Gleason, 137 Mo. 594.
(2) The trial court refused to give effect to the ad-
verse possession which it affirmatively found to have
been enjoyed by the defendant Barrow, by reason of
the provision of Sec. 1886, R. S. 1909, which provides
in substance that nothing contained in any Statute of
Limitation shall extend to any land given, granted,
sequestered or appropriated to a pious use. While it
might be conceded that if the Old School Presbyterian
Church body had remained in control of the property
up to the date of the institution of the suit, and had
at all times used it for religious purposes as such
properties are used, then there might be some ground
to support the trial court's ruling in the matter, but
it will be noticed that according to the testimony even
the Old School Presbyterian Church, the original gran-
tee from Boyd ceased to use it for religious purposes
long before it attempted to part with the title to the
Universalist General Convention. (3) A proper
construction of the deed from Boyd to the elders of
the Old School Presbyterian Church would be that the
property should be used for the use of that particular
congregation of said Old School Presbyterian Church
and that any use of the premises by some other con-
gregation, even though a religious body, would be a
violation of the trust imposed by said deed. It is
questionable whether the Old School Presbyterian
Church or its elders had any authority whatever to
convey the property, as under the terms of the deed
the property was required to be used for the benefit of
that particular church and none other. (4) Then
in the conveyance made by the parties attempting to
act for the Old School Presbyterian Church to the
Universalist General Convention, it will be noted that
the grantee was described merely as a New York cor-
poration and there was no recital in the deed that it is
a religious body or that it should use the premises
conveyed for pious purposes. There is no proof that

Strother v. Barrow.

the Universalist General Convention was a religious body unless the recital in the deed which it undertook to make to the Methodists should be taken as such proof. (5) The trial court found affirmatively that the defendant's adverse possession began in 1890 and continued down to the date of the institution of the suit. Now, assuming there was a time in the early part of defendant's adverse possession when the disputed strip in controversy was used for pious purposes, thereby making the Statute of Limitation unavailable, still if there was any break in such pious use, the Statute of Limitation would immediately begin to run, and, under well-settled authority, where a Statute of Limitation once begins to run it continues to run. (6) The acknowledgment of the deed from the Universalist General Convention to the trustees of the Methodist Episcopal Church, South, is fatally defective: First, it does not conform to the requirements of Sec. 2799, R. S. 1909; second the acknowledgment does not recite that the alleged chairman and secretary of the board of trustees of the corporation were sworn; third, there is no recital in the acknowledgment that the seal affixed to the instrument is the corporate seal of said corporation; fourth, there is no recital in the acknowledgment or in the deed itself that the instrument was made by authority of the board of directors or by authority of the board of trustees of the said corporation, the Universalist General Convention.

*T. B. McGinnis* and *Tapley & Fitzgerrell* for respondents.

(1) The demurrer to the evidence was properly overruled. R. S. 1909, Sec. 1886. (2) There was no abandonment of the property by any of the religious organizations; in fact the opposite was clearly shown by the acts of each of them. Abandonment is a ques-

tion of intention.  Nonuser is not of itself sufficient. Tracy v. Bittle, 213 Mo. 302; Cravens v. Moore, 61 Mo. 178; Judson v. Malloy, 40 Cal. 299; Hummell v. Railroad, 175 Pa. St. 537; Academy v. Academy, 47 S. W. (Ky.) 617.  The entire testimony shows that the appellant is precluded from benefit of any Statute of Limitations.  R. S. 1909, Sec. 1886.  (3)  The case being tried before the court sitting as a jury the parties are concluded by the findings on controverted questions of fact.  Waddell v. Williams, 50 Mo. 216. (5)  The deeds complained of were regular on their face and were prima facie executed by authority. Fire Clay Wks. v. Ellison, 30 Mo. App. 71.  (6)  Under the pleadings and evidence the appellant cannot raise the objection that deeds are defective.  Hunt v. Searcy 167 Mo. 159.

LAMM, J.—Ejectment.  Defendant appeals from a judgment in favor of plaintiffs for an undivided two-sixths interest in a tract situate in the hamlet of Ashley, Pike county.

Ashley was not laid out true to the cardinal points of the compass.  Its subdivisions run from the northeast to the southwest.  Among them is a square acre once belonging to Boyd, the common source of title. Boyd deeded seventy feet in rectangular shape off the southwest end of his acre to the Old School Presbyterian Church, putting the title in named trustees. The residue he deeded to his daughter, Mrs. Dorsey, and she conveyed to defendant.  The church seventy feet passed by mesne conveyances (so plaintiffs claimed) to plaintiffs as trustees of the Ashley Church of the Methodist Episcopal Church, South.  It will be observed that plaintiffs, who sued for all, were awarded possession of an undivided two-sixths interest only, and abided the judgment.  One phase of the dispute is over the boundary line between the church's seventy feet and Barrow's residue; another

is adverse possession. The parcel in controversy is a strip eleven feet wide at one end, six feet ten inches at the other, and three and sixteen-hundredths chains long.

A map, furnished by appellant is, so far as it goes, accurate enough to aid in grasping the situation, viz.:

The petition was conventional; the answer was a general denial, coupled with two affirmative pleas (one the ten-year and the other the thirty-year Statute of Limitations); the reply was conventional.

At the close of plaintiffs' case and again at the close of the whole case, defendant interposed a demurrer to plaintiffs' evidence, which was overruled and he saved the point. No other instructions were asked on either side. The trial was to the court with-

out the aid of a jury and, at defendant's request, the court made a finding of facts.

Facts essential to the determination of questions raised will appear in connection with rulings thereon.

The assignments of error are:

"1.   The court erred in refusing defendant's instructions in the nature of a demurrer to the evidence offered at the close of plaintiffs' testimony and at the close of all the testimony.

"2.   The court erred in refusing to give effect to defendant's adverse possession, which he affirmatively found to have continued from 1890 down to the date of the institution of the suit.

"3.   The court erred in finding that the strip of ground in controversy was not conveyed by the deed from Cary A. Boyd to Elizabeth Dorsey and by the deed from Elizabeth Dorsey to the defendant Barrow.

"4.   The court erred in interpreting the deed from the alleged officers of the Old School Presbyterian Church to the Universalist General Convention, a New York corporation.

"5.   The deed purporting to be from the Universalist General Convention, a corporation, to the trustees of the Methodist Episcopal Church, South, dated October 25, 1905, was ineffective to convey any title and the acknowledgment thereto was fatally defective."

Of these in their order.

I.  *Of the demurrers.*

In effect, the demurrers search, under guise of a general form, errors specified in assignments 2, 3, 4, and 5. Hence a disposition of those specifications will be tantamount to an appellate ruling on the demurrers. Accordingly we pass by that assignment *eo nomine,* as filling no separate function on appeal.

II. *Of adverse possession.*

The court found that defendant had been in possession under claim of title uninterruptedly and adversely since the year 1890 up to the date of the suit, 1908. To break the force of that finding, it also found that the Statute of Limitations could not be invoked as a bar to plaintiffs' claim or to create title in defendant. *Contra,* that Sec. 1886, R. S. 1909, applied to the facts—that section reading :

"Nothing contained in any Statute of Limitations shall extend to any lands, given, granted, sequestered or appropriated to any public, pious or charitable use, or to any lands belonging to this State."

To break the force of that ruling, defendant contends that, assuming the original grant to the trustees of the Old School Presbyterian Church to be for a "pious and charitable use," yet on the facts here, that use was abandoned; whereat (on such abandonment) the statute began to run and continued to run, although a pious use of the property was subsequently resumed. In outline such is the controversy under this head.

We are of opinion the ruling, *nisi,* was correct. This because:

(a) For present purposes it will be assumed that the strip in dispute passed by the deeds in plaintiffs' chain of title, and not by the deeds in defendant's. Whether that assumption be correct will be looked into presently. On that assumption, out of abundant caution, we reserve the question whether a stranger to conveyances creating a pious or charitable use can, in aid of his claim of adverse possession by limitation, raise the point of its abandonment. Whether the grantor who conveyed to the use, or his descendants, under the notion of a reverter, may make the point, or whether some proper party suing in equity to regulate the use may assert rights under a nonuser or abandonment, we need in no wise consider. In this

discussion, we take the point as we find it and shall assume, without deciding, that defendant can make it.

(b) From ancient times a pious use has been considered a charitable use. The quoted statute speaks of both, but in a broad sense the one includes the other. The principles of law governing one govern the other. Under the old English act, known as the Statute of Charitable Uses (43 Elizabeth, ch. 4), money and lands granted for the *repair* of churches created a charitable use. That act is part of our common law, but it has been held that its enumeration of charities is not preclusive. There are other objects deemed charitable in a legal sense (Buchanan v. Kennard, 234 Mo. 117), and a grant for the *building* of a church has always been considered as raising a charitable use—religion being but part and parcel of charity for purposes of jurisprudence. Indeed defendant's counsel concede, impliedly, that the original grant from Boyd was to a pious use within the meaning of section 1886, supra. The deed from the common source of title, Boyd, passed the title in 1870 to named trustees, elders of the Old School Presbyterian Church in the town of Ashley in consideration of one dollar and the further consideration of grantor's "love, regard, reverence, attachment and affection for said Old School Presbyterian Church." The grant ran to said elders and their legal successors in office. In ordinary warranty form, its *habendum* clause reads:

"To have and to hold the premises aforesaid with all and singular the rights, privileges, immunities and appurtenances thereto belonging or in any wise appertaining unto the said parties of the second part and unto their legal successors to be elected as aforesaid forever, in trust, for the use of the congregation of said Old School Presbyterian Church, and in trust, that the said parties of the second part and their successors to be elected, as aforesaid, shall have the control and direction of the use and occupancy of the

building now being erected on said described lot, when erected, for the worship of God and the transaction of any business that has for its object the promotion of the Redeemed Kingdom.''

Now, it is hornbook doctrine that grants for a pious or charitable use (as this evidently was) are favored by the law. The legal maxim is: The law favoreth charity. [Wing. 144.]    Another is: The church is to be more favored than a person. (*Ecclesiae magis favendum est quam personae.*)   So, too, the idea of perpetuity is of the very essence of such grant. ''If the court considered that it was for the public benefit that the property in question should be devoted forever to fulfilling the purpose named, it held that purpose good.   Thus it held good all trusts for promoting the established religion, also all trusts for keeping up schools and hospitals, and many other trusts.   These trusts, for purposes which the law considers it for the public benefit to perpetuate forever are called charitable trusts.   This is the only general definition which can be given of the word charity.'' [Tyssen on Charitable Bequests, p. 5.]

In judicially approaching, then, the question of abandonment, the right doctrine needs must be that the law looks with disfavor on the abandonment of a pious or charitable use.   Therefore, on *a priori* principles the evidence required to establish abandonment should be of a stringent and conclusive character, leaving no reasonable loophole for escape from the conclusion.

Abandonment of a pious use involves two elements, to-wit, (1) the intent to abandon permanently and (2) the physical fact of nonuser for religious purposes.   These two elements must conjoin and both be operative at the same time or there can be, in the very nature of things, no abandonment.   After a careful study of the record we are of opinion the evidence did not satisfactorily show the presence of either ele-

ment. The most that can be said for that evidence was that religious services at times languished, at spells was discontinued and was then resumed. The fact of resumption itself suffocates the idea of an intent to abandon. There was some testimony that defendant used the back yard of the church premises to garden for a season or so, and one season stored potatoes in the church. He was janitor while the Universalists were in control, had the key and what he did on his own initiative in making a wareroom of the edifice may tend to show desecration by him, but does not show abandonment of the pious use by owners. Shortly before the Universalists sold to the Methodists, they moved the Bible, organ, pulpit, bell and most of the benches to a church they controlled in a neighboring village. On the heels of that denuding act, they conveyed to the Methodists by a deed couched in terms not only precluding the idea of abandonment but reconsecrated the church to religious services. Witness the following clause: "In trust that said premises shall be used, kept and maintained and disposed of as a place for divine worship," etc.

The trial court found against defendant on the question of abandonment; there was testimony sustaining that finding. With a law case in that fix, we are bound by his finding on the fact. [Donaldson Bond and Stock Company v. Houck, 213 Mo. l. c. 426-7.] With abandonment eliminated, there can be no question but what section 1886, supra, avoids the application of any Statute of Limitations.

The trial court rightly so ruled.

(c) It is faintly argued (or suggested) that the Boyd deed to the Presbyterians should be construed to mean that the property must always be used by that particular congregation of the Old School Presbyterian Church and that any use of the premises by some other congregation would be a violation of the trust imposed by the deed. But is not that an exceedingly

narrow and sour view? No authority is cited to sustain it, and if there had been we would hesitate long before following it. In what just sense would it be an abandonment of a pious use to have one religious denomination take over by purchase the church edifice of another? Are not all Christian churches, whatever their peculiar tenets of mere creed, at bottom devoted to the same pious use—the cure of souls? Mr. BINNEY'S definition of a charitable use which courts are fond of using, used by him in his argument in Vidal v. Philadelphia (43 U. S. 127) is: "And whatever is given for the love of God or for the love of a neighbor in the catholic and universal sense, given from those motives and to these ends, free from the stain and taint of every condition that is personal, private or selfish, is a gift for charitable uses." There are cases in which that definition has been held too restrictive, but we know of none holding that a grant coming within that definition would not raise a charitable use. This court has given a broader definition (Missouri Historical Society v. Academy of Science, 94 Mo. l. c. 466) viz.: "Any gift not inconsistent with existing laws, which is promotive of science or tends to the education, enlightenment, benefit, *or amelioration of the condition of mankind*, or the diffusion of useful knowledge, or is a public convenience, is a charity."

In the light of the scope and intendment of such definitions, how could it be justly ruled that the mere transfer of title and the custody of a church of one Christian denomination to another is an abandonment of a pious use? Any Christian church is but a hospital for souls. A curate is but a physician to souls (a cure). So far as this court can see all churches have that end in view as their *raison d'etre.*

Finally, we recur to the question whether this defendant can make the point at all. Mark, those who made the grant do not complain; those who received it are standing on it and rest content (*vide,* St. Louis

Public Schools v. Risley, 28 Mo. 1. c. 419, *arguendo*);
this is not a proceeding in equity to regulate the mis-
use of a charity, and by what right does a stranger to
the grant suggest its invalidity? Is that question not
*res inter alios acta* as to him? So, under the proof,
as a member of the Universalist Church he enjoyed
the charitable benefits of the grant and it comes with
ill grace from him to now impugn it. None of these
suggested questions are argued in briefs and conse-
quently they are reserved.

III. *Did the court err in finding that the strip in
dispute was not conveyed by, nor was it within the
calls of, the deeds in defendant's chain of title?*

We think not. In the first place the conveyances
under which defendant holds are junior conveyances
to the original grant to the Presbyterians. Defendant
purchased what remained of the Boyd acre after the
seventy feet were conveyed off of the southwest end,
and the conveyances in his chain refer to the Presby-
terian deed and, in terms, excepted the church tract
therefrom. In the next place, the chief (if not the
whole) force of defendant's claim rests on the Statute
of Limitations and not on a grant by deed. Moreover,
on defendant's theory the side of the church building
is on the division line between the seventy feet and
the residue of the acre. On plaintiffs' theory the little
strip in dispute lies between the church building and
defendant's grant. In this condition of things, the
surveyor of Pike county, Beauchamp, made a survey.
The deeds in both chains of title call for corner stones,
courses, distances, etc. He testified he found those
stones and ran his lines in accordance with the calls
of the deeds. He testified his survey was correct and
based on plats, conveyances, corner stones of former
surveys, etc. He found, and so testified, that the dis-
puted strip lies within the description in plaintiffs'
chain of title and not within that in defendant's. He

was examined in connection with a plat which is not reproduced in this record. His testimony relates to a *lettering* on that plat indicating the distances, courses, corner stones, beginnings, endings, etc., mentioned by him. It is now insisted that his cross-examination established the inaccuracy of his survey. The laboring oar was on defendant to impugn the official survey. [Carter v. Spracklin, 246 Mo. 116.] But absent the plat concerning which he testified and the lettering to which he referred, it is impossible to say that defendant's contention is correct, for much of the testimony is meaningless without the plat and letters. As the impossible excuses persons, so it excuses judges. Some of the precepts of the law (of its very bones and framework) are: No one is bound to do what is impossible. [2 Bou. 116.] Impossibility is an excuse in law. (*Impotentia excusat legem*—Coke, Litt. 29a.) We have enough to do, to do what we *can*, not what we *can't*.

The point is ruled against defendant.

IV. *Of error in interpreting the deed from the Presbyterians to the Universalists.*

As developed in appellant's brief and argument error in this assignment hinges on the proposition that under that deed there was a break in the pious use. The idea seems to be that the grant in the Presbyterian deed was to "The Universalist General Convention, a corporation existing under the laws of the State of New York."

The deed being silent on the business character of that corporation and there being no reference in it whereby it can be seen on its face that the grant was for a pious use, we are asked to hold, as a matter of law, that it was a grant to a use not pious. The inference being that with such a break in the use, the title itself fails and plaintiffs must be cast in a strictly legal action of ejectment. But we shall not so hold.

When the Universalist General Convention subsequently conveyed title to the Methodists, it, at the first chance it had to speak on the point, described itself as a religious corporation. We take its word for it, absent countervailing proof. So, the proof is that the Universalists when they acquired title actually used the edifice for church purposes and that defendant had charge of it on behalf of that denomination of Christians. Do not acts interpret words? Not only so, but, absent proof to the contrary, as here, we would not be willing to hold (against the indications in the name of the corporation) that it was not an instrumentality of the Universalist Church and was seized of the property to the use of that denomination. The presumption would be, in the first instance, that the Presbyterians would not intend to break the pious use by their conveyance. Surely defendant does not want us to rule (as a matter of law and without any proof) that the faith of that branch of the Christian Church is not a Christian or pious faith, or that their churches are not dedicated to a pious use. Learned counsel, taking us into their confidence, assure us that the Universalist faith "is a beautiful faith." If necessary, we would be willing to rule that it was a *comfortable* faith, and, if we were permitted to express a judicial hope, it would be the hope that it may turn out to be a true one in the great Day of Final Accounts; for does not a very good book say we are all miserable sinners?

We pause to ask: May a mere earthly court (the which we admit we are) go out of its way to repudiate the sunny theological dogma, much doubted by some stout polemics, viz., that every man will be finally saved and dwell forever with the felicitous? No! Emphatically, no! Angels and Ministers of Grace defend us! So the melancholy Dane exclaimed (when startled by a well-known apparition) and so say we. We say it in the form of a pious exclamation, because

sometimes an exclamation is as good as a discourse,
and let it go at that. Why should we decide the point
when we have no jurisdiction of the subject-matter?
Says COKE soberly (Coke, Litt. 232b): "There be
three kind of unhappy men. He that hath knowledge,
and teacheth not. He that teacheth, and liveth not
thereafter. He that knoweth not, and doth not enquire
to understand." But that pronouncement is too broad
as a rule regulating judicial discourse. Indeed, get-
ting unanimity of opinion in questions of religious
faith in the decision of cases, has not been so easy
as to invite a wide play of unnecessary exposition in
ghostly matters. Agreeable thereto the inquisitive
scholar may find abundant grounds in Boyles v. Rob-
erts, 222 Mo. 613, and State v. Railroad, 239 Mo. 196.
[*q. v.*]

V. *Of the deed from the Universalists to the
Methodists.*

The substance of the objection made to that deed
(split into specifications in appellant's brief) is that
its acknowledgment is bad, reading:

State of Minnesota, County of Hennepin, ss.

On this 25th day of October, 1905, personally came be-
fore me, a notary public in and for the county and State
aforesaid, the above named Henry W. Rugg and G. L. Dem-
arest, personally known to me to be respectively the chair-
man of the Board of Trustees of the Universalist General
Convention, and the secretary thereof, and the officers they
represent themselves to be, and acknowledge to me that
they signed the foregoing instrument in behalf of the Uni-
versalist General Convention and as chairman of the Board
of Trustees and secretary for the uses and purposes therein
mentioned.

In witness whereof I have hereunto set my hand and
seal, this day and year written.

The *testimonium* clause of the deed and the signa-
tures thereto run thus:

Strother v. Barrow.

In witness whereof the chairman of the Board of Trus-
tees of the said Universalist General Convention and the
secretary thereof, have hereunto set their hands, and seal
of said corporation, the 25th day of October, 1905.

Henry W. Rugg,
Chairman of Board of Trustees.

(Corporate Seal.)

G. L. Demarest, Secretary.

To that deed the corporation seal was affixed, as
indicated. A mere glance shows that the certificate
of acknowledgment does not conform to the *form* the
statutes say "may be used" in acknowledging cor-
porate deeds. [R. S. 1909, Sec. 2799.] But he has read
that statute to little purpose who concludes that the
statutory form is necessary to a good acknowledg-
ment. The language of the section in that particular
is not mandatory but permissive. It does not say the
form *must* or *shall be* used, but that it "may be used."
In the exposition of that statute it has been held that
the acknowledgment to a corporate deed, if good be-
fore the statute was passed, would be good after it
was passed. [Huse v. Ames, 104 Mo. l. c. 102-3.] We
look, then, to all related statutes and to the exposition
given them by appellate courts. There are cognate
sections prescribing how a corporation may hold and
can convey real estate, and what the certificate of
acknowledgment must show. Comparing the manda-
tory requirements of section 2799 with sections 2790
and 3001—all strictly *in pari materia*—it will be seen
that the certificate of acknowledgment complies sub-
stantially with the requirements of those sections.

In St. Louis Public Schools v. Risley, 28 Mo. l. c.
419, it was ruled that when the common seal of a
corporation appears to be affixed to an instrument and
the signatures of the proper officers are proved, courts
are to presume that the officers did not exceed their
authority and that when an act is within the powers
of a corporation, and its existence is witnessed by

an instrument clothed with the formalities requisite to bind it, there is no hardship in the rule which imposes on one objecting to its validity the necessity of showing that it was without the assent necessary to its existence. The logic of that holding precludes the necessity of showing corporate assent, or the order of a board of directors, in the first instance.

In Perry v. Price, 1 Mo. l. c. 649, it is ruled that a corporation being an invisible body, it cannot manifest its intention in its deed by any personal act or oral discourse and speaks only by its common seal. The logic of that ruling stresses the use of the corporate seal. Though private seals are abolished, yet the use of a corporate seal on a corporate deed remains an essential. [R. S. 1909, Sec. 2773.]

In City of Kansas v. Railroad, 77 Mo. l. c. 185, a doctrine of the Risley case, supra, was reaffirmed to the effect that in aid of a certificate of acknowledgment, reference may be had to the instrument itself or any part of it; and that it was the policy of the law to uphold certificates when substance is found and not to suffer conveyances, or the proof of them, to be defeated by technical or unsubstantial objections.

In Eppright v. Nickerson, 78 Mo. l. c. 485, et seq., will be found an acknowledgment of a corporate deed, less substantial than the one in this case, which was held good.

In Railroad v. City of St. Louis, 66 Mo. l. c. 247, may be found an apposite pronouncement, viz.: "As the one company had the right to sell, and the other to purchase, it follows that the deed, under the seal of the corporation and signed by the proper officers of the company, is prima facie evidence that the officers did not exceed their authority, and if the assent of the stockholders to such conveyance was not had, it devolved upon the defendants to show that fact." The logic of that ruling is to simply invoke the car-

dinal maxim that things are presumed to be rightly done. [Parks v. Hartwell, 240 Mo. 1. c. 546.]

. · .So,. THOMPSON, J., in Missouri Fire Clay Works v. Ellison, 30 Mo. App. 1. c. 72, lays down this proposition: "Authority on the part of the president and secretary to execute a deed for the corporation need not be affirmatively shown by a party claiming under the deed, but, in the absence of evidence to the contrary, such authority is presumed." [See Musser v. Johnson, 42 Mo. 74, and Shewalter v. Pirner, 55 Mo. 218, arguendo.]

. The signatures of the officers are sufficiently attested by the certificate in question; the assent of the directors will be assumed under the doctrine of the cases cited, and a corporate seal attached to the deed is of substance in determining the sufficiency of the acknowledgment as to corporate intent.

We have not undertaken to state the specifications of the objections to this acknowledgment seriatim. It is sufficient to say that all of them are disposed of against appellant in the foregoing discussion.

The point is ruled against defendant.

With this ruling, the cause is determined in favor of plaintiffs. Let the judgment be affirmed. All concur, Graves, P. J., in result.