The CURATORS OF the UNIVERSITY OF MISSOURI, a public corporation, et al., Respondents,

v.

The UNIVERSITY OF KANSAS CITY, a not-for-profit corporation, et al., Respondents,

Norman H. Anderson, Attorney General of the State of Missouri, Respondent,

and

The Board of Trustees of Park College, a corporation, et al., Appellants.

No. 53321.

Supreme Court of Missouri,

En Banc.

March 10, 1969.

Rehearing Denied April 14, 1969.

Lawrence R. Brown, Alvin D. Shapiro, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for respondents University of Kansas City, and others.

Jackson A. Wright, Paul M. Peterson, Columbia, Shook, Hardy, Ottman, Mitchell & Bacon, by Edgar Shook and Everett A. Olson, Jr., Kansas City, for respondents, plaintiffs below.

Heywood H. Davis, Larry J. Bingham, Dietrich, Tyler, Davis, Burrell & Dicus, Kansas City, for appellant Park College.

SEILER, Judge.

Did the University of Kansas City "cease to exist", within the meaning of the will of Miss Lena Haag, when, in 1963, by agreement between the Curators of the University of Missouri and the University of Kansas City, which stated that " * * * it is to the best interests of the parties and of the State of Missouri in order to meet the growing educational needs of the state that University transfer to Curators those of its assets hereinafter described [real estate, buildings, furnishings, equipment, libraries, etc. owned by the University] so that the university now known as The University of Kansas City will become a part of the University of Missouri, to be administered by the Board of Curators of the University of Missouri and

financial support provided by the State of Missouri", the properties of the university were transferred to the Curators of the University of Missouri, who have since established and maintained at Kansas City a university known as University of Missouri at Kansas City?[1] If so, by the will of Miss Haag, the some $150,000 in the Lena Haag Fund for Deserving Students and the $522,000 in the Lena Haag Endowment Fund should be paid to the Trustees of Park College. Asserting that they had succeeded to the rights and title of the Board of Trustees of the University of Kansas City to these funds, the Curators of the University of Missouri brought this action against the University of Kansas City and its Board of Trustees, the Board of Trustees of Park College, and Norman H. Anderson, Attorney General, seeking the right to assume control of the funds for the purposes stated in Miss Haag's will. The trial court entered judgment in favor of the Curators. The Trustees of Park College appealed. The University of Kansas City and its Board of Trustees support the decree of the trial court.

All the facts are stipulated, although there is disagreement over the admissibility and relevancy of portions of the stipulation. Miss Haag's will, dated November 3, 1939 (she died in 1951) contained the following provisions:

"X

"I give and bequeath to the Board of Trustees of The University of Kansas City, of Kansas City, Missouri * * * One Hundred Thousand Dollars * * * which shall be called 'The Lena Haag Fund for Deserving Students.'

* * * * * *

"As soon as practicable after my death the trustee shall use so much of the income of the trust fund as is practicable to make loans to students attending The University

1. For the most part, the plaintiff Curators of the University of Missouri will be referred to herein as plaintiff or curators; the University of Kansas City will be referred to as U.K.C. or university, and the University of Missouri at Kansas City will be referred to as U.M.K.C.

of Kansas City. Such of said loans as are made shall be to such of said students as rank highest among the applicants for such loans from the standpoint of character, scholastic merit and financial need.

\* \* \* \* \* \*

"In determining the amount of the fund, both the principal and interest shall be credited to the fund and when the amount of the fund so determined equals Two Hundred Thousand Dollars \* \* \* then any excess over and above said amount shall become a part of the Lena Haag Endowment Fund for the University of Kansas City hereinafter provided for. The remainder of the Lena Haag Fund for Deserving Students shall continue in all respects as theretofore.

"XI

"All the rest, residue and remainder of my estate not hereinafter provided for, I give, devise and bequeath to the Board of Trustees of The University of Kansas City, of Kansas City, Missouri to be known as The Lena Haag Endowment Fund for the University of Kansas City.

\* \* \* \* \* \*

"No part of the fund or assets creating the trust provided for in Article XI shall at any time be used for the construction of any buildings and the principal of said trust shall at all times be kept intact. The income therefrom shall be used in the sole discretion of the trustees to establish and maintain a teaching chair, or chairs in some department of said University, if needed, preference being given to a chair or chairs of music, without however intending to limit the use of such income to such specific chair or chairs. Each chair so established shall be appropriately designated and referred to as 'The Lena Haag Chair of Music' or of other subject as the case may be.

"Said University is requested to refer in its catalogue and other publications issued from time to time to the chair or chairs established with or by virtue of the income

from said fund. Any amount of income received by the Trustees not needed from time to time for the purpose of establishing or maintaining such chair or chairs may be used by the Trustees for such purposes of said University as the Trustees may in their sole judgment and discretion deem to be of the greatest advantage to the University, not including the erection of buildings.

\* \* \* \* \* \*

"If The University of Kansas City should cease to exist (an event which I do not anticipate and trust shall never occur) then and in that event both the 'Lena Haag Fund for Deserving Students' and the 'Lena Haag Endowment Fund for The University of Kansas City' shall thereupon be paid and distributed by the Trustees hereinbefore referred to, to the Board of Trustees (or other governing Board occupying a similar position) of Park College of Parkville, Missouri, to be added to the endowment funds of Park College and to be used for such purposes as said endowment funds may be lawfully used and to be known as the 'Lena Haag Fund for Park College'.

\* \* \* \* \* \* "

It is agreed that Park College is a privately endowed and supported institution, as was U.K.C. and that U.M.K.C. is a state-supported institution.

The parties are also in agreement that evidence relevant and material as to the occurrence of the condition subsequent ("If The University of Kansas City should cease to exist") is admissible. This must necessarily include the 1963 agreement, as well as what took place then and thereafter as to the continued existence or non-existence of U.K.C. as a university. The parties all take the position there is no ambiguity on the face of the will, particularly in the words "If The University of Kansas City should cease to exist." However, according to the Restatement of Property (Vol. III, § 241, pp. 1189–1190): "\* \* \* [A]ny ascertainment of the meaning of language requires consideration of the atmosphere in which the conveyance orig-

inated, and an ascertainment of the associations or connections understood by the conveyor to exist between the terms of the conveyance and the various possible objects in the external world * * *.

"In the case of a deed or will, as in the case of any writing, this process is always necessary * * *."

See, also, 57 Am.Jur., Wills, § 1041, p. 676, stating: "A moment's reflection will show that in giving effect to any will, even the simplest and clearest, some extrinsic evidence must be admitted to identify the persons and property referred to in the will and to enable the court to apply the words of the will to the matters to which it relates * * *."

Therefore, inasmuch as Miss Haag did not exist or make her will in a vacuum, we hold it is proper to consider enough of the stipulated information about the testatrix to give us some general idea of her standpoint, environment and interests, which we discern as follows: Miss Lena Haag was a native Kansas Citian and a life-long resident of the city. She died in 1951 at the age of 87. She was 75 when her will was made in 1939. She was educated in the Kansas City schools and in Moravian College for Women, Bethlehem, Pennsylvania.[2] Her chief interest was in music and art. She inherited a substantial fortune upon the death of her mother in 1919 and handled it advantageously. Miss Haag was quiet and retiring. For the last 15 years of her life she took a deep interest in the development of U.K.C., and in addition to the bequest involved in this case, she donated, anonymously, the funds for the Liberal Arts building, one of the principal buildings of the University, built in 1936–37.

Certain provisions of the contract between U.K.C. and the curators must now

be outlined.[3]   As earlier stated, it recites a determination that U.K.C. is to transfer to curators its assets "so that the university now known as The University of Kansas City will become a part of the University of Missouri, to be administered by the Board of Curators of the University of Missouri and financial support provided by the State of Missouri." By deed of gift, U.K.C. was to transfer to the curators its land and buildings and all its tangible personal properties, including furnishings, libraries, and equipment (save for certain personal property in dormitories subject to liens of federal agencies, which are first to be released). All transfer documents were to contain a reverter clause, conditioned on the failure or refusal of the curators to operate continuously a university on the real estate described. By supplemental contract, these reverter provisions were limited to 20 years from the date of conveyance. The agreement provided that the curators would designate the real estate as the "William Volker Campus" and would retain and continue to make use of all names already designated or assigned by those who had made gifts of buildings, rooms, chairs, or scholarships. The curators were to appoint a chief administrative officer who would have charge of U.M.K.C., under the direction of the President of the University of Missouri. From and after closing date U.M.K.C. was to be operated, managed and controlled by the curators. U.K.C. agreed to retain its corporate existence and purposes. The curators agreed to respect all tenure rights of faculty members of U.K.C. and to assume all faculty employment contracts through the 1963–64 academic year. It was agreed that all trust funds held by U.K.C. for special purposes and uses and transferred to the curators would be held and used by the curators in strict accordance with the terms under which they were held by U.K.C. It was stated the transac-

2.  A long-established private school, then for women only, see American Universities and Colleges, Cartter, Ninth Ed., Council on Education, Washington, D.C., 1964, pp. 993–994; Lovejoy's College Guide, 1968 ed., p. 348.

3.  The original agreement was made March 9, 1963 and there was a supplemental contract entered into July 23, 1963.

tions could not be completed unless, not later than September 1, 1963, the General Assembly had enacted and the Governor signed, a law appropriating to the use of the curators for the operation of a university in Kansas City during the 1963–65 biennium a sum not less than $7,100,000 (which was done, see Laws of 1963, p. 43, approved July 8, 1963).

On or about July 25, 1963, upon the transfer of assets of U.K.C. to the plaintiff curators, one Carleton F. Scofield, who had been President and chief administrative officer of U.K.C. became Chancellor of U.M.K.C. Also, upon such transfer, which occurred during the regularly scheduled summer term, plaintiff curators assumed the employment contracts of all those then employed by U.K.C., in both academic and non-academic positions, and operated during the remainder of the summer term upon generally the same curriculum, plans and schedules established theretofore by defendant university. Plaintiff curators has thereafter operated and maintained U.M.K.C. at substantially the same location and said U.M.K.C. has conducted classes, conferred degrees, carried out research and performed other educational functions.

The Haag funds were not transferred to the curators, pending determination of this litigation begun February 24, 1965. The trial court concluded " * * * that the educational institution named * * * continues to exist within the meaning of Miss Haag's will, and plaintiff, The Curators of the University of Missouri, being now the governing body of said educational institution, is the trustee as provided by said will."

Park College contends that the educational institution which Miss Haag knew and had in mind when she wrote her will "has definitely ceased to exist". On the other hand, plaintiff curators, supported by U.K.C., contends the educational institution which Miss Haag intended to benefit continues to exist within the meaning of her will, "that the purpose of her gifts was to help students and to advance learning, both to be done in Kansas City" and that the trial court was right in concluding that "Her actions during her lifetime and the wording of her will clearly indicate that her intent was in the university continuing as an educational institution rather than in its particular corporate name or whether it received its financial support from public or private funds. In essence, the university as she knew it continued to exist after the transfer the same as before * * *."

We hold that under the stipulated facts as to the agreement between U.K.C. and the plaintiff curators and what happened thereafter, the University of Kansas City ceased to exist as the words were used in Miss Haag's will, and accordingly under the further terms of the will the two funds should go to the Trustees of Park College.

Miss Haag was an educated woman with wide interests and the means to do what she wanted. Her will stated that she had the counsel and advice of her attorney in its preparation. The language is direct, not artful, and there is no reason to ascribe to the words used other than their ordinary, commonly understood meaning. So examined, the word "cease", here used as an intransitive verb, as pertaining to an existing institution, situation or state of affairs, means to discontinue, terminate, stop, to come to an end, be at an end. *"Stop* is the everyday, *cease,* the more literary or poetical word." The word "exist", in the sense here used of having place in the domain of reality, having objective meaning, means "to have actual or real being * * * to continue to be: maintaining being." While under the terms of the agreement, U.K.C. agreed to continue its corporate existence, this was only a paper existence so far as operating a university (which is defined as "An institution organized for teaching and study in the higher branches of learning and empowered to confer degrees in special departments, as theology, law, medicine and the

arts") is concerned.[4] After July 25, 1963, the University of Kansas City stopped, had no further actual or real being, no longer continued to be, and ceased to exist as a university or educational institution. It no longer awarded any degrees, conducted classes or performed any educational functions and it had no funds or staff with which to carry on a university. It could not cease functioning as a university and at the same time be considered to be continuing its existence as a university. It had nothing to do with the operation of the University of Missouri at Kansas City. In accord with what was anticipated by the language in the preamble of the agreement, referred to above, it had "become a part of the University of Missouri". This is not changed by the stipulated fact that the curators selected the man who was the last President of U.K.C. to be the first Chancellor of U.M.K.C. The curators were free to select whomever they pleased. It is true the curators took over the same teaching staff, but this they were obligated to do only through the 1963–64 academic year. The curators continued with the same classes and students, but this would be what one would expect with a transfer of a university occurring in the middle of a term of summer school, as was the case. The curators were in no way obligated to continue with the same curriculum and, of course, the student population would change in any event with passage of time. With a few relatively unimportant exceptions, the curators are free to operate U.M.K.C. as they see fit, even to the extent of discontinuing it. The plaintiff curators alleges in its petition that "all of the rights and powers of said trustees with reference to the government of said university passed to the plaintiff * * *." Actually, the plaintiff curators could accept no less, because under the constitutional provisions, Art. IX, § 9(a), 1945 Constitution, V.A.M.S., the government of the state university is vested in the board of curators.

The fact that another university took over in the place of U.K.C. has no bearing on the issue before us in view of the express language of Article XI as to what should happen if U.K.C. ceased to exist. What plaintiff and respondent university are asking is that we rewrite Miss Haag's will so that the part under examination would read, "If the University of Kansas City should cease to exist *and if no other university, public or private, takes its place,* then", etc. Miss Haag provided in Article X that the Board of Trustees of U.K.C. were to use the income of The Lena Haag Fund for Deserving Students " * * * to make loans to students attending The University of Kansas City * * *", and that any excess of the fund above $200,000 was to " * * * become a part of the Lena Haag Endowment Fund for the University of Kansas City * * *." She then specified in Article XI that the Lena Haag Endowment Fund for U.K.C. was to be used " * * * to establish and maintain a teaching chair, or chairs in some department of said University * * *." The two funds are specifically stated to be for particular purposes of use at the University of Kansas City by its students. Such was the dominant purpose of the gift (she was trying to help U.K.C. and its students just as she had earlier helped with her donation of the Liberal Arts building when U.K.C. was struggling for existence) and this distinguishes the present situation from the cases relied on by respondents where the essence of the bequest was that the gift should be applied to general educational or charitable purposes which could be carried out by the successor institution.

The language then used by Miss Haag in the latter part of Article XI—namely, "If The University of Kansas City should cease to exist (an event which I do not anticipate and trust shall never occur) then

---

4. These definitions are from Webster's New International Dictionary, Third Edition; Webster's New International Dictionary, Second Edition, Unabridged; The Oxford English Dictionary, and The Random House Dictionary of the English Language, Unabridged Edition.

and in that event both [funds] * * * shall thereupon be paid * * * [to] Park College * * * "—shows that while she thought it unlikely that U.K.C. would cease to exist, she had the possibility in mind and provided what should be done if it occurred. It is true Miss Haag desired that students would continue to benefit from the financial assistance she had provided even if U.K.C. ceased to exist, but she made it clear that in such event it would be students of Park College. There is nothing in the language of the will saying that she intended that just any university which happened to operate at the same location as, and in place of, U.K.C. and which had students who could benefit therefrom, was to take over her gift. For all we know, the idea of her gift going to a tax-supported state university may have been anathema to her. She directed that if U.K.C. ceased to exist the gift was to go to Park College, which is and was a privately supported institution. Miss Haag certainly would have been aware that the University of Kansas City was, too. U.K.C. was founded in the depression of 1933 and at the time her will was made in 1939 it was by no means certain that U.K.C. would survive indefinitely and, of course, we know that it did not. It is significant that Miss Haag selected another private institution to receive her gift if her first choice failed, rather than a state supported one. There is no reason in the record before us to suppose she desired the University of Missouri to receive her gift if U.K.C. went out of existence.

What the trial court has done here is to make an uncalled for application of cy pres, the doctrine that " * * * equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible * * * ", Bogart, Trusts and Trustees, 2d Ed., § 431, P. 390. We say "uncalled for application", because of the well-established rule that " * * * If the testator makes an express provision as to the disposition of the property in case the particular purpose fails, that provision is controlling * * * ", Scott on Trusts, Third Ed., § 399.2, p. 3095. In such a situation the doctrine of cy pres is inapplicable. That is what happened here. Miss Haag provided what should be done with the funds if U.K.C. ceased to exist. There is no basis for the action of the trial court in applying her charity to providing scholarship loans for students and establishing teaching chairs at a state-supported university, a purpose which she did not provide for in her will, and which runs counter to the alternative she did provide.

We do not agree with the contention of the respondents that the fact Miss Haag's bequest was made to the Board of Trustees of U.K.C. as trustee and that the will defined "trustee" as the Board of Trustees governing U.K.C. and the "successors of said Board occupying the same relative position with respect to said University", changes what is required to be done with the funds in event U.K.C. "should cease to exist". In that event the will provides the funds shall be paid and distributed "by the Trustees hereinbefore referred to" (which would include the plaintiff curators under respondents' contention) "to the Board of Trustees (or other governing Board occupying a similar position) of Park College". Even if the plaintiff curators were the successor trustee to the Haag funds upon the transfer of U.K.C., it does not change what happens to the funds if U.K.C. ceases to exist, which respondents agree is the principal issue before the court.

Both sides claim support from the fact that in a codicil made December 20, 1949, which covered a number of other matters, Miss Haag revoked a bequest of $1,000 to The Kansas City Cradle, made in her original will of November 3, 1939, "inasmuch as said institution has gone out of existence." The original corporate purposes of the Cradle, organized by pro forma decree in 1915, were to promote the placing-out method of providing for homeless children in select family homes and to own

and maintain a hospital for such children and provide for their education and welfare. The Cradle owned and operated a substantial two-story brick building, used among other purposes as a hospital for children, and located adjacent to St. Luke's Hospital of Kansas City. In 1946, the trustees of the Cradle filed a petition for dissolution on the ground it was no longer possible to carry out the purposes for which the corporation was created, due to the changes in Missouri law regarding adoption of children, and stating that St. Luke's Hospital was willing to take the property and use it as part of the hospital if it could lawfully do so. The Cradle trustees also obtained a decree amending the corporate purposes by omitting the portions relating to promoting the placing-out method of providing for homeless children and enlarging the portions pertaining to a hospital. The circuit court then, on October 29, 1947, after an amended petition for dissolution had been filed setting forth the amended objects and purposes, entered a decree of dissolution, reciting that the purposes of St. Luke's were substantially the same as those of petitioner and authorizing the Cradle to convey its property to St. Luke's, which was done. The building, according to the stipulation, "has been and is now used as a children's ward" by St. Luke's.

There is no showing as to how much Miss Haag actually knew about the above events and the details of the changes in corporate purposes. Indeed, however, the problem of homeless children continued to exist, as well as their hospital care (which was also one of the concerns of the Cradle) and if as respondents' contend, the key to whether Miss Haag considered an institution continued to exist depended on whether the purposes behind her gift could be carried out by some other institution, rather than on whether the institution which she knew, trusted, and desired to help in its work continued to exist, she could easily have substituted St. Luke's Hospital for the Cradle in her will, which of course, she did not do. Further, the Kansas City

Cradle matter all occurred during Miss Haag's life and she acted upon it, which is not the case here, and we are not convinced the Cradle matter is sufficiently close on the facts to be decisive one way or the other.

The decree of the trial court is reversed and the cause remanded with directions to enter a decree ordering the funds paid to the Trustees of Park College.

PER CURIAM:

The foregoing opinion by SEILER, J., written in Div. One, is adopted as the opinion of the Court en Banc. The judgment is reversed and remanded with directions.

HOLMAN, C. J., and HENLEY, SEILER and MORGAN, JJ., and STONE, Special Judge, concur.

STORCKMAN, J., dissents in separate dissenting opinion filed.

DONNELLY, J., dissents and concurs in dissenting opinion of STORCKMAN, J.

FINCH, J., not sitting.

STORCKMAN, Judge (dissenting).

I cannot agree with the holding of the majority opinion that the University of Kansas City has *ceased to exist* within the meaning of that term as used in the will of Miss Lena Haag.

This is a charitable trust and the evidence to establish abandonment or forfeiture of a charitable use created by will or deed must be clear and conclusive. Strother v. Barrow, 246 Mo. 241, 151 S. W. 960, 963 [4]. The interpretation placed on the trust language by the principal opinion unduly restricts and is out of harmony with the purpose of the testatrix as disclosed by the facts and circumstances in evidence.

There are no Missouri cases which have interpreted the term "cease to exist" as applied to a charitable institution, but cases

from other states are enlightening in this respect. In re Hagan's Will, 234 Iowa 1001, 14 N.W.2d 638, 152 A.L.R. 1296, involved a charitable bequest in equal parts to two educational institutions with the condition subsequent that should "either Drake University or Penn College cease to exist" the income from the entire trust should be turned over to the survivor. As in this case, Penn College encountered financial difficulties and the college was acquired and operated by a new corporation. It was held that the college did not cease to exist within the meaning and purpose of the bequest. Similar cases are collected and discussed in an annotation in 152 ALR at page 1303, entitled "When existence of institution named as beneficiary deemed to have ended, within contemplation of provision of will in that regard". In re Estate of Daley, 6 Ariz.App. 443, 433 P.2d 296, reaches a similar result in deciding whether a medical clinic has ceased to exist. The Daley case decided in November 1967 discusses the more recent cases on the subject.

In my opinion the dominant intention of Miss Haag was to benefit a university in Kansas City and such purpose has not been violated by the institution being taken over and managed by the Board of Curators of the University of Missouri. I am in accord with the views expressed in the opinion written in this case by Welborn, C., but not adopted which in part states:

"In our opinion, that was not such an occurrence as was contemplated would cause the gift over to become effective. Classes continued be to conducted at substantially the same location (presumably including Haag Hall), degrees were conferred and the vital functions of a university continued. There was no cessation of the existence of a university. Unquestionably the name of the institution was not the same nor was it governed by the same governing body. Nor was its source of financial support the same. However, such changes were not shown to have been what the testatrix wished to guard against by the condition subsequent. There continued to exist a university at the home city of the testatrix, attended by students who would benefit from the financial assistance Miss Haag had provided. The record does not show the endowment fund income had, in fact, been used. However, in 1963, the University of Kansas City and thereafter the University of Missouri at Kansas City had a School of Music (see Official Manual, State of Missouri, 1967–1968, p. 462) so that Miss Haag's preference for the endowment of a chair of music could be given effect. In other words, Miss Haag's fundamental purpose of furthering the cause of higher education in Kansas City could still be accomplished by and on behalf of the same people who would have been involved had there not been a transfer from the University of Kansas City to the curators. Surely, there may now be more students interested in seeking loans from the fund which Miss Haag established, inasmuch as there has been some change in admission policies and a sizable increase in enrollment (University of Kansas City had 1987 full-time students for the fall semester beginning in 1962. University of Missouri at Kansas City had 3739 for the fall semester beginning in 1965.). We find no reason to suppose that Miss Haag would have looked with disfavor upon such an extension of the services of the university. University admission policies do change. The stipulation here sets out the policies of the University of Kansas City for 1959–1960, 1960–1961, 1962–1963 and 1963. We don't know what the policies were in 1939, but it would have been unusual for them to have remained unchanged since the date of Miss Haag's will. Any donor of funds to assist students and provide chairs of learning must realize that admission standards of the institution attended by the students will not remain constant. Student-faculty ratios likewise fluctuate. A decreasing ratio is not, however, evidence of cessation of existence as an institution of higher education. Nor is an enlargement of the physical plant."

The corporate existence of the University of Kansas City has not been extinguished and apparently legal title to the physical properties would revert to it if the University of Missouri abandons the operation at the Kansas City campus within the next twenty years. Miss Haag undoubtedly knew of the University's precarious financial condition. She had helped its building program in her lifetime and gave it further help in her will. She chose to make it rather than Park College the primary beneficiary of the trust fund. In my opinion the stability given the Kansas City University by its affiliation with the University of Missouri promotes rather than defeats her purpose and intention.

For these reasons I respectfully dissent.