6 Ariz. App. 443 (1967)
433 P.2d 296
In the Matter of the ESTATE of Jeanette E. DALEY, sometimes known as Jeanette Estella Daley, Deceased.
PALMS CLINIC AND HOSPITAL, INC., an Arizona non-profit corporation, Appellant,
v.
ARIZONA SOCIETY FOR CRIPPLED CHILDREN AND ADULTS, INC., et al., affecting the Valley National Bank of Arizona and Union Title Insurance & Trust Company, Appellees.
No. 1 CA-CIV 378.
Court of Appeals of Arizona.
November 14, 1967.
Rehearing Denied December 19, 1967.
Review Denied February 15, 1968.
*444 Gorodezky, Stuart & Diamond and Allen L. Feinstein, Phoenix, for appellant.
George D. Locke, Phoenix, for appellee, Valley National Bank.
McKesson, Renaud, Cook & Miller, by Joseph B. Miller, Phoenix, for appellee, Samuel Gompers Memorial Rehabilitation Center, Inc.
Virginia, Hash and Jerome R. Kase, Phoenix, for appellee, Girls' Ranch of Arizona, Inc.
KRUCKER, Judge.
Jeanette E. Daley, the decedent, executed her will on March 10, 1959, died on November 5, 1960, and her will was admitted to probate on December 12, 1960.
The will created two trusts: one with a corpus of $30,000 with Union Title Insurance and Trust Company of San Diego as trustee; and the second, consisting of the residuary estate, with the Valley National Bank of Phoenix as trustee.
The San Diego Trust is for a term for the lives of named relatives of the decedent plus 21 years. The net portions of income *445 are to be given in specific amounts to the relatives, with the balance, if any, to be divided among five named charitable organizations in the following amounts:

 20% to Crippled Children Society of Phoenix, Arizona;
 10% to the Masonic Home for Aged Persons of California, a California
 corporation;
 25% to the Shrine Crippled Children's Hospital, San Francisco,
 California;
 25% to Girls' Ranch, Inc. of Arizona; and

"Twenty percent (20%) to the Palms Clinic and Hospital, an Arizona corporation, having its principle place of business at 1104 East Culver Street, Phoenix, Arizona; said funds to be used solely for the payment of expenses incident to medical research, and none of said funds to be used for the payment of a salary or salaries to the Director or for the acquisition of real property. * * *"
Sub-paragraph (c) which follows immediately the above provision states:
"Should any of the above-mentioned charities cease to exist, then the amount which said charity would have received hereunder, except for its nonexistence, shall be paid to the remaining charities in the percentage hereinabove set forth." (Emphasis supplied.)
The document further provides that, upon the expiration of the term of the San Diego Trust, the corpus is to be distributed to these same organizations in the same proportions as they received the excess income of the trust. There is repeated the same restriction on the use of funds by Palms Clinic, and the same clause in the event any of the mentioned charities should cease to exist.
The residuary trust creates in the trustee, Valley National Bank, the duty "to make quarterly disbursements from net income and proceeds received from the liquidation of principle from the trust estate" to the same organizations, including Palms Clinic, which are beneficiaries of the remainder interest under the San Diego Trust, with the same specifications as to use of funds by Palms Clinic and the same clause should any of the charities cease to exist.
On November 26, 1962 the Superior Court of Maricopa County entered a Decree of Partial Distribution wherein the sum of $30,000 was distributed to the trustee of the San Diego Trust. This distribution was in accordance with the provisions of the will as to income beneficiaries, principle distributees, conditions on the use of funds, and distribution in the event that beneficiaries cease to exist.
On May 27, 1963 the court approved the decree of partial distribution which distributed 80 percent of the residuary estate to the Valley National Bank as trustee of the residuary trust, to be distributed among the named charitable beneficiaries in the will, with the exception that no determination was made as to the 20 percent of the residuary estate provided for in the will to Palms Clinic.
On June 10, 1963 Samuel Gompers Memorial Rehabilitation Center (which had successfully intervened as a successor to the Maricopa County Society for Crippled Children and Adults, etc. as beneficiary under the will) and the Girls' Ranch of Arizona petitioned for distribution of the residue of the estate after final settlement. Claiming that the Palms Clinic had ceased to exist, they sought to modify the November 26, 1962 Decree of Partial Distribution to eliminate Palms Clinic as a legatee of the will and as a beneficiary in interest in the San Diego Trust and the residuary trust.
A hearing on the petition to eliminate the Palms Clinic as a beneficiary was held on June 24 and 25, 1964. At that hearing the evidence showed Palms Clinic had been since 1950, and was still classified as a charitable organization by the Internal Revenue Department. The Articles of Incorporation were filed with the Arizona Corporation Commission and a Certificate of Incorporation was issued on June 16, 1949. The objectives of Palms Clinic as stated in *446 the Articles of Incorporation were to operate a clinic, furnish medical care, and conduct research. The corporate minute book of Palms Clinic showed that the decedent was elected a trustee of the corporation on September 8, 1949. The minutes of the annual meeting of June 5, 1950 show that decedent was elected vice-president of the corporation and a trustee. The minute book disclosed that the decedent attended the annual meetings of the corporation from 1950 through 1956 and from 1958 through 1960.
The testimony of Dr. Reed D. Shupe, President of Palms Clinic, disclosed that Palms Clinic was organized in 1949 at the suggestion of attorney George Locke, who was decedent's attorney and is involved in this proceeding as attorney for Valley National Bank, which is executor of the will and trustee of the residuary trust. Dr. Shupe's testimony further showed that the decedent was not an incorporator but became a member of the Board of Trustees and attended every annual meeting of the corporation until her death. Since 1957, Palms Clinic has had no employees, has not been listed in the City Directory since 1953, and has ceased being listed in the telephone directory; but has had a bank account, receives rent, and pays taxes and insurance on the property owned by it at 1104 East Culver Street in Phoenix. Dr. Shupe testified that Palms Clinic operates his private medical practice and receives the income from it, and that he received a salary from Palms Clinic. He further testified that as president of Palms Clinic he has been conducting a medical research program as part of the activities of Palms Clinic, generally on the subject of gamma globulin for asthma and upper respiratory illnesses of children.
Testimony of the Director of the Incorporating Division of the Arizona Corporation Commission showed that at that time Palms Clinic was "not in good standing" because it was delinquent in paying fees required of non-profit corporations by a law enacted in 1962. (A.R.S. § 10-211, subsec. B as amended) This testimony further showed that Palms Clinic was still a corporation because a corporation is "still in existence" until after certain things occur; i.e., a specific period of delinquency passes, the corporation upon notice does not show cause for its delinquency, and the Arizona Corporation Commission enters an order terminating the corporation. The Articles of Incorporation of Palms Clinic have not been revoked. (On August 16, 1965 the court entered a nunc pro tunc order permitting Palms Clinic to amend the findings of fact to show that the registration and report fees, and penalty for the years 1963 and 1964, were paid on September 2, 1964.)
On December 1, 1965 the court entered final amendments to the findings of fact and conclusions of law against Palms Clinic. Insofar as relevant, the findings of fact hold: that Palms Clinic was incorporated as a non-profit corporation on June 16, 1949; that Palms Clinic was not in good standing with the Arizona Corporation Commission as of the date of hearing of the petition for distribution of the residue; that as of the date of death of the decedent and as of the date of the hearing of the petition Palms Clinic was not actively engaged in any charitable pursuits; that as of the date of death of the decedent the president of Palms Clinic was practicing his profession as a private physician and Palms Clinic was performing no function whatsoever as a charitable organization; that Palms Clinic had ceased to exist as a charity before the date of death of the decedent; that Palms Clinic was not a charity as of the date of death of the decedent; and that as of the date of the hearing of the petition for distribution of the residue, Palms Clinic did not exist as a charity. Palms Clinic filed objections to the form of the judgment, which were denied, and judgment was entered on December 29, 1965 based on the court's finding of fact and conclusions of law. Palms Clinic brings an appeal from the entry of this judgment. The account of the executor filed on June 9, 1965 shows that the 20 percent of the residuary *447 estate held originally for the account of Palms Clinic amounted, in principal and accumulated interest, to $258,277.81.
The basis for the appellant Palms Clinic's appeal is the contention that Palms Clinic is an existing corporation and that it has continued to exist and operate to the same extent and in the same manner with which decedent was personally and fully familiar at the time she executed her will designating Palms Clinic as a beneficiary. We agree with this contention. The rule is clear that the Appeals Court is not bound by the conclusions of law of the trial court. Miller v. Boeger, 1 Ariz. App. 554, 405 P.2d 573 (1965); Ali v. Sitts, 1 Ariz. App. 439, 404 P.2d 100 (1965). If the facts are substantially undisputed the Appellate Court is not bound by the findings of fact of the trial court. Brasher v. Gibson, 2 Ariz. App. 91, 406 P.2d 441 (1965).
"The cardinal rules for construction of all wills is to ascertain the intention of the testator, and this intention is to be ascertained from the words of his will, taking into view when necessary or appropriate the circumstances under which it was made. * * * It is an elementary rule in the construction of wills that the language used must be liberally construed with a view to carrying into effect what the will as a whole shows was the real intent of the testator." Newhall v. McGill, 69 Ariz. 259, 212 P.2d 764 (1949). In re Estate of Harber, 99 Ariz. 323, 409 P.2d 31 (1965).
Accord, In re Conness' Estate, 73 Ariz. 216, 240 P.2d 176 (1952); Valley National Bank v. Hartford Accident & Indemnity Co., 57 Ariz. 276, 113 P.2d 359 (1941).
"One rule is that the determination of the intention of the settlor or parties to a trust instrument involves a construction of the instrument, where construction is necessary, in the light of the surrounding circumstances at the time of the execution of the instrument. The court places itself in the position of the trustor at the time of the creation of the trust and interprets what he said or done in the light of his environment at that time." Olivas v. Board of National Missions, etc., 1 Ariz. App. 543, 405 P.2d 481 (1965).
Here we think the intent of the decedent is clear; i.e., to provide funds to Palms Clinic to carry out medical research.
We find no requirement in law or equity that a corporation be in the same position to accomplish its purposes before it receives funds through a will as it will be after it receives the funds.
The trial court's findings of fact showed that the Palms Clinic was incorporated in June of 1949; that it was not dissolved nor forfeited for non-use of its franchise; that it had failed to pay statutory fees and so was not in good standing. Failure to pay statutory fees has no effect on corporate existence without positive act by the Corporation Commission. A.R.S. § 10-212, and see, Robinson Brick and Tile Co. v. Copperstate Supply Co., 100 Ariz. 28, 410 P.2d 96 (1966). We find no evidence of any revocation by the Arizona Corporation Commission. On the contrary, the record showed that registration and report fees and penalty fees for 1963 and 1964 were paid to the Corporation Commission on September 2, 1964. The existence of a corporation does not terminate until legally dissolved in accordance with the law of its creation. Commissioner of Internal Revenue v. Allegheny Broadcasting Corp., 3 Cir., 179 F.2d 844 (1950).
The testimony and exhibits at the hearing show that the status, condition and operation of Palms Clinic were essentially the same as of the time decedent executed her will on March 10, 1959 as they were when she died a year later and when the hearing was held five years later. It was, and indeed still is, a nonprofit corporation with virtually no funds to perform the research for which it had been organized. For eleven years the decedent was an officer and trustee of the corporation and attended its annual meetings. She was undoubtedly aware of its financial condition when she drew her will. We do not feel *448 that she intended that it would be disqualified because its financial condition had not improved at the time of her death.
In its brief, appellee admits the existence of Palms Clinic as a de facto corporation. The cases cited by appellee in support of its position deny the bequest to the named beneficiary corporation where it is shown that the corporation is in such a position that it cannot fulfill the charitable purpose. That is not shown here. All that may be inferred is that Palms Clinic has not up until this time fulfilled a charitable purpose. There is no showing that Palms Clinic cannot and will not fulfill the function contemplated by the decedent should the legacy be distributed as required by the express provisions of the will. We find that nothing has occurred to give effect to Paragraph Eight of the will, "* * * should any of the above-mentioned corporations cease to exist. * * *"
Both parties cite a number of cases in which the bequest was denied on the grounds that the decedent's charitable purposes could not be fulfilled. In re Dunton's Will, 28 Misc.2d 939, 214 N.Y.S.2d 157 (1961), (corporation in default, untraceable); In re Walter's Estate, 150 Misc. 512, 269 N.Y.S. 400, 402 (1933), (corporation bankrupt, in hands of trustee, operations discontinued); In re Hare's Estate, Sur., 149 N.Y.S.2d 428 (1955), (discontinued operations, no meetings, officers had requested attorney to dissolve, creditors paid, held, beneficiary would have no use for the money); In re Brundrett's Estate, Sur., 87 N.Y.S.2d 851 (1940), (hospital had ceased to operate, bankrupt); In re Harrington's Estate, 151 Neb. 81, 36 N.W.2d 577 (1949), (seminary closed, faculty discharged, property and funds in hands of court); Garner v. Home Bank & Trust Co., 171 Tenn. 652, 107 S.W.2d 223 (1937), (college insolvent, found legally dead, legacy would be diverted to receiver); National Association for Cerebral Palsy, Inc. v. United Cerebral Palsy Association of Denver, 141 Colo. 69, 346 P.2d 582 (1959), (charitable organization dissolved, no members, no meetings, funds or assets, no officers or records); accord, In re Shelton's Estate, Sur., 87 N.Y.S.2d 853 (1942); In re Scott's Estate, 1 Misc.2d 206, 145 N.Y.S.2d 346 (1955), (sanitorium had no property, staff, or patients, denied right by state to act as hospital. Held, not capable of using bequest for purpose intended by testatrix). In the case of Camden Trust Co. v. Christ's Home of Warminster, 28 N.J. Super. 466, 101 A.2d 84 (1953), where the will provided for a gift to a church if it should exist five years after decedent's death, and at that time there had been no services for three years, no pastor, and the building was in deplorable condition and unable to be lighted or heated; the court held that the mere fact that the donee had not been legally declared nonexistent in the sense that its charter be revoked or forfeited did not make it impossible to effectuate the charitable purposes of the testator. We think these cases are clearly distinguishable from the instant case because the one element common in all the cases cited above is that the beneficiary was held unable to make use of the testamentary bequest. That is not the case here.
Charitable bequests are upheld when the charitable purposes of the decedent can be carried out, even where technical defects exist. See Inasmuch Gospel Mission v. Merchantile Trust Co. of Baltimore, 184 Md. 231, 40 A.2d 506 (1945), (Mission bankrupt, reorganized, still in operation); In re Hagan's Will, 234 Iowa 1001, 14 N.W.2d 638 (1944), (college acquired and operated by new corporation); Old Colony Trust Co. v. Winchester Home for Aged Women, 324 Mass. 258, 85 N.E.2d 622 (1949), (charitable corporation had transferred all assets to another corporation, not dissolved, had annual meetings, elected officers, held, "still in existence, though not active"); accord, City of Belfast v. Goodwill Farm, 150 Me. 17, 103 A.2d 517 (1954). In Old Colony Trust Co. v. Third Universalist Society of Cambridge, 285 Mass. 146, 188 N.E. 711 (1934) where a church had transferred its real and personal property *449 and temporarily suspended religious services, but did not dissolve, the court said:
"There is no doubt about the identity of the legatee. The society is precisely and accurately described in each will. It continues to exist with full corporate powers. It has not been dissolved. It is capable of accepting such legacies as here are in question without overstepping the bounds of its corporate competency. Nonuser by the corporation of its corporate powers works no forfeiture of them and does not operate as a surrender of its charter * * * [t]here is nothing in the record to impair the right of the society to receive the legacies * * * [t]he purpose of the legacies does not appear to have failed. * * *"
In Rhode Island Hospital Trust Co. v. American National Red Cross, 50 R.I. 461, 149 A. 581 (1930), the association charter had been forfeited for non-filing of returns. The court upheld the gift conditioned on reviving the charter, saying, "If its charter is revived, the [corporation] will be as much in existence as at the time of the execution of the will and trust deed."
Note in the above cases that the bequest is upheld if it is shown that the legatee is able to make use of it for the purpose envisioned by the testator.
The second point presented to us by the appellant is whether or not the residuary trust created in the will is a perpetual charitable trust or whether the corpus is to be distributed to the charitable beneficiaries when the purported purpose of the trust is completed.
The court below determined that the powers given to the trustee indicate clearly that the decedent intended a perpetual charitable trust for the benefit of the named charitable organizations that continue to exist. We agree with this construction. Appellant Palms Clinic cites several isolated passages from the will which refer to the "life" or "duration" of the trust and claims that this shows decedent intended a terminable trust to be distributed in toto to the beneficiaries. To give such a construction to these isolated passages would do violence to the intent and desires of the decedent as expressed in the will as read from the four corners, and this we cannot do. In re Conness' Estate (supra), Newhall v. McGill (supra), Doss v. Kalas, 94 Ariz. 247, 383 P.2d 169 (1963). A perpetual charitable trust has a life and it has duration. Even though a trust may be perpetual, it may become terminated on the happening of certain stated conditions, as in this case where the will provides "* * * should any of the above-mentioned charities cease to exist. * * *" The language cited by the appellant is not controlling. The germane portions of the will are:
SEVENTH. The trustees of the respective Trusts shall have all such powers as shall be necessary or appropriate for the effective administration of these Trusts, including, but not by way of limitation, the following powers:
* * * * * *
2. To hold any property received into this Trust as long as it may deem advisable, and to continue and operate any business or enterprise which it may receive hereunder at the risk of the Trust Estate. (Emphasis supplied)
EIGHTH.
* * * * * *
2. Said Trustee shall receive and collect the principal and income of the Trust Estate, and shall dispose of or disburse the same to the organizations and in the manner hereinafter provided.
(a) It shall be the duty of my Trustee to make quarterly disbursements from net income and proceeds received from the liquidation of principal from the Trust Estate to the following organizations in the proportions stated, to wit: * * * (Emphasis supplied) (Here are set forth the percentages to the five charitable beneficiaries including Palms Clinic.)
* * * * * *
NINTH: (a) As directed in Paragraph EIGHTH 1., my Arizona Trustee *450 shall administer the Trust Estate in such manner as to provide the greatest income therefrom, without disturbing the well-being of any of the businesses or corporations, in which said property may be invested. * * * (Emphasis supplied)
The will provides that the remainder of the corpus of the San Diego Trust be distributed to the charitable beneficiaries at the death of the last named living relative. No such direction exists concerning the residuary trust. Nowhere in the will do we find any specific directions for winding up the residuary trust and distribution of the corpus to the charitable beneficiaries. The trustees are empowered, inter alia, to invest and reinvest, to hold, manage, control, sell, and consolidate. The only provision we find relating to termination of the trust is the clause in the paragraph enumerating trustee's powers which states:
"11. Upon the termination of this Trust, to convey, assign and deliver to such persons, corporations, or organizations entitled thereto, the Trust property in kind, namely: In real property or securities at values to be determined by the Trustee, or at its option to convert such securities or property into cash for the payment of the net proceeds thereof to such persons, corporations or organizations."
Since as stated above it is conceivable that this trust will terminate, we feel that this provision is merely a direction to the trustee in the case of that eventuality, rather than an express direction to distribute at a specified time.
In its brief, the appellant raises the issue of estoppel, claiming that the November 26, 1962 decree of partial distribution to the San Diego Trust fixed its status as a beneficiary under the will, citing Shattuck v. Shattuck, 67 Ariz. 122, 192 P.2d 229 (1948) and In re Balke's Estate, 68 Ariz. 373, 206 P.2d 732 (1949), and since it was an appealable order, (A.R.S. § 12-2101, as amended) and not appealed from, it became final and binding (A.R.S. § 14-641, as amended). Thus, the claim is that appellee's objection to Palms Clinic's status was untimely and they could not be heard to complain.
Since we hold in favor of the appellant, we find it unnecessary to decide whether the appellee's objection was timely or whether the doctrine of estoppel applied.
Reversed and remanded for proceedings not inconsistent with this opinion.
HATHAWAY, C.J., and MOLLOY, J., concur.
NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12-120, subsec. E.