453 P.2d 966

Helen Irene Rymal BREWER and the First National Bank of Arizona, Phoenix, as Executor of the Estate of Netta L. MacDonald, Deceased, Appellants,

v.

Francis M. PETERSON and Walda J. Peterson, his wife, Appellees.

No. 1 CA–CIV 407.

Court of Appeals of Arizona.

April 28, 1969.

Rehearing Denied June 3, 1969.

Review Denied June 24, 1969.

Moore, Romley, Kaplan, Robbins & Green, by Elias M. Romley and Kenneth J. Sherk, Phoenix, for appellants.

Lewis, Roca, Beauchamp & Linton, by James Moeller and Charles F. Wilkinson, Phoenix, for appellees.

MOLLOY, Judge.

This appeal attempts to abolish the "disappearing" presumption which has been adopted by our Supreme Court in a line of cases,[1] and to cause the adoption in this state of the "equitable apportionment" doctrine as to the payment of succession taxes imposed by federal and state laws upon decedent's estates.

The action brought asked for a declaratory judgment that certain gifts made by Netta L. MacDonald shortly before her death to her nephew, Francis M. Peterson,

1. *See* Seiler v. Whiting, 52 Ariz. 542, 549, 84 P.2d 452, 455 (1938) ; Silva v. Traver, 63 Ariz. 364, 368, 162 P.2d 615, 617 (1945) ; In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063, 1071 (1952) ; In re Pitt's Estate, 88 Ariz. 312, 318, 356 P.2d 408, 411 (1960).

**456**

were void, and, if not void, that the nephew be required to bear a proportionate share of the substantial estate taxes that are likely to be imposed upon this estate.

The plaintiff, Helen Rymal Brewer, is the great grandniece of the deceased. The nephew is one of deceased's two closest blood relatives living at the time of her death, her only other surviving relative of as close a relationship being Mrs. Mark Bobo, the grandmother of the plaintiff.

The gifts to the nephew were made over a period of approximately one year, at a time when Mrs. MacDonald was around the age of 85 years. The estate of this elderly Arizona pioneer consisted primarily of ranch and farm land west of the City of Phoenix. On January 18, 1960, Mrs. MacDonald executed a warranty deed which transferred the "River Ranch," approximately 660 acres of land, to her nephew. The value of this ranch constituted nearly 80 per cent of her total assets. On February 18, 1960, she quitclaimed to him her interest in the MacDonald Canal," used to serve her farm land, and transferred to him the motor vehicles and farm equipment used in connection with the ranch. Early in the year 1961, she gave to the nephew the cattle and $10,000 in cash. There remained in her estate, after these transfers, only a 155-acre parcel upon which her home was located, and miscellaneous personal property. Mrs. MacDonald died on October 7, 1961.

The value of the gifts made to the defendant is in excess of $1,200,000. Property remaining in the estate is of a value of about $386,000. The Federal Internal Revenue Service has taken the position that the gifts to the nephew were made in contemplation of death, within the purview of § 2035 of the Internal Revenue Code of 1954, 26 U.S.C.A. The evidence is undisputed that Mrs. MacDonald was prompted to make these donations by an article she read in a newspaper which emphasized the inconveniences to heirs caused by probate

proceedings. Under the evidence before us, we believe any court would hold these transfers must be included in her gross estate under both the Arizona [2] and Federal Estate Tax provisions. *See* United States v. Wells, 283 U.S. 102, 118, 51 S.Ct. 446, 452, 75 L.Ed. 867, 876 (1931); Fatter v. Usry, 269 F.Supp. 582 (D.C.E.D.La.1967). In the event this is the case, the estate taxes levied will exceed the probate assets available for distribution by a substantial amount.

To invalidate these transfers, the great grandniece, who, as a baby, had lived in Mrs. MacDonald's home along with her mother for a number of years and who remained an object of Mrs. MacDonald's affection until the time of her death, contended that, at the time of these various transfers, Mrs. MacDonald was mentally incompetent and acting under undue influence of the nephew. The case was tried to a court, without a jury, and the trial court found that the decedent was mentally competent at the times of the various transfers and that there had been no undue influence practiced. Only the finding of no undue influence is attacked on appeal.

The briefs in this court present a scholarly attack upon, and an able defense of, the vanishing presumption doctrine. The appellants' brief urges that, as a matter of law, there was a "confidential relationship" between Mrs. MacDonald and her nephew; that, accordingly, "the burden of proving the absence of undue influence" shifted to the defendant-nephew; and that, as a matter of law, this burden of proof was not met. The appellees rejoin that the evidence did not conclusively establish a "confidential relationship," but that, regardless of whether such a relationship existed, the question of whether there was undue influence was one of fact as to which the evidence was in conflict and that this conflict was resolved by the trial court. We agree with this latter position.

The evidence discloses without question that Mrs. MacDonald had been very fond

2. *See* A.R.S. § 42–1511, subsec. A, par. 2, as to inclusion of gifts made in con- templation of death insofar as the State tax is concerned.

of her nephew, the defendant, all of his life. After his return from the Korean War, he and his wife lived upon Mrs. Mac-Donald's "River Ranch." Until the time of her death, the nephew worked for his aunt in the operation of this farm. Mrs. Mac-Donald lived on her nearby "home place" and oversaw her nephew's work.

In 1958, Mrs. MacDonald fell and broke her hip, and on January 20, 1960, two days after the conveyance of the River Ranch to her nephew, she fell and broke her arm. As the result of these two injuries, and a general weakening in mental and physical function from her advanced years, Mrs. MacDonald left more of the operation of the ranch to her nephew.

There is testimony that some years prior to these transfers, she had informed a friend that she had intended to give the River Ranch to her nephew and that she had told another friend, after she had returned home from her hospitalization for the broken arm, " * * * that she was so happy, that she had executed a deed and it was recorded and everything, the ranch and the cattle were Franky's." On both of these occasions, the evidence indicates that the nephew was not present.

The two principal transfers, those occurring in January and February of 1960, were witnessed not only by a notary public but by two friends of the family, Mrs. Jewel Jordan, State Auditor, and by Mr. Edward Winburne, Mrs. Jordan's brother, a rancher who had rented pasture land from Mrs. MacDonald. Both of these witnesses testified that Mrs. MacDonald appeared to be in full possession of her faculties and to be pleased that the transfer of the ranch was accomplished by the warranty deed. The notary public also testified as to the mental competency of the grantor and to the apparent lack of undue influence. All witnesses agreed that Mrs. MacDonald was, by natural temperament, a strong-willed person. She continued to transact some of her important business, without any apparent advice from her nephew, until only a few months before her death.

The test of undue influence insofar as the execution of a deed is concerned has been stated by our Supreme Court to be:

"Undue influence which will justify the setting aside of an executed deed must have been of such a nature as to deprive the grantor of his free agency, and thus to render his act more the offspring of the will of another than of his own will." Pass v. Stephens, 22 Ariz. 461, 472, 198 P. 712, 716 (1921).

In connection with a will, the latest pronouncement, as to the nature of undue influence, is:

"It is necessary for the contestants to introduce sufficient evidence to show that the testatrix' will was overpowered and the will of another substituted in its stead, in order for a jury to find that the will was a product of undue influence." In re Estate of Harber, 102 Ariz. 285, 292, 428 P.2d 662, 669 (1967).

We see no substantial distinction between these definitions, and we unabashedly use, as have both litigants, authorities pertaining to undue influence in the execution of wills as have bearing upon a challenge to these *inter vivos* gifts. We see no reason to have two sets of legal rules to govern these analogous problems.

A great portion of the briefs has been devoted to showing that one side or the other, at various stages of this trial, had the burden of proving undue influence, or lack of it, by various degrees of proof. We believe the procedural posture on appeal creates no need for us to determine whether, when, or to what degree, this burden was cast back and forth. This is a case tried to the court; hence we have no problem of jury instructions.

■ In re Harber's Estate, *supra*, particularly "Note 1" at 102 Ariz. 291, 428 P. 2d 662, makes it clear that in a will contest, the burden of proof never shifts from the contestant to prove undue influence. As we have stated, we see no reason to have a different body of law for gift deeds; but, even if we accept the suggestion of Amado v. Aguirre, 63 Ariz. 213, 161 P.2d 117, 160

**458**

A.L.R. 1126 (1945), that, in the case of a gift deed, when there is a "confidential relation" (63 Ariz. at 219, 161 P.2d 117) between the donor and donee, the burden is on the donee to establish by "clear and convincing evidence" (63 Ariz. at 219, 161 P.2d 117) that there was no undue influence, the result would be the same here. Whether Mrs. MacDonald was under undue influence or not in making these transfers is a matter of determining which body of conflicting evidence to accept and which to reject. This, even when the burden of proof requires "clear and convincing" evidence, is largely a matter for the trier of fact. Tonelson v. Haines, 2 Ariz.App. 127, 406 P.2d 845 (1965).

We believe it was proper for the trier of fact to consider all the inferences which arise from the evidence that the nephew caused the legal documents effectuating these transfers to be prepared, that Mrs. MacDonald was elderly and in poor health, that the nephew managed the River Ranch for her, that he secured no independent legal advice for her in connection with these transfers, and that he told members of the family, after her death, that " 'I wished I had have had her deed it all to me while I was at it.' " [3] *See* In re Estate of McCauley, 101 Ariz. 8, 10–11, 415 P.2d 431, 433–434 (1966). It is our view that this circumstantial evidence bearing upon the factual issue of undue influence was not wiped out by a denial of undue influence by the nephew. *See* Oana v. Haskell, 7 Ariz.App. 493, 441 P.2d 259 (1968).

█ But there is no showing here that the trial court disregarded this testimony. There is ample other evidence in the record, the bare essentials of which we have outlined previously, which would indicate that the independent wishes of Mrs. MacDonald were satisfied by these transfers. It is not *every* influence, particularly when exercised by persons who are natural objects of bounty, that is *undue* influence. In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063

(1952); Amado v. Aguirre, 63 Ariz. 213, 161 P.2d 117 (1945); Pass v. Stephens, 22 Ariz. 461, 198 P. 712 (1921).

█ The plaintiffs' witnesses appeared to be as much or more interested in the result as the defendants' witnesses. We see no evidence here which was so conclusive as to mandate a trial court to find that the will of Mrs. MacDonald was overcome and the will of the nephew substituted for it. The controlling law, as we see it, is that an appellate court must assume that the trial court did no wrong, in the absence of a showing to the contrary. Frederickson v. McIntyre, 52 Ariz. 61, 64, 78 P.2d 1124, 1126 (1938). We have no way of knowing here that the trial court misapplied any law pertaining to burden of proof or presumptions, whether they be vanishing ones or not, and hence we are obligated to affirm the conclusion that there was no undue influence practiced in connection with these transfers.

As to the doctrine of "equitable apportionment," we likewise find ourselves obliged to avoid the principal issue, that is, whether in the absence of a statute, it should be judicially determined that estate taxes must be apportioned between the recipients of the property included in the gross estate of the deceased. Our reason for so concluding is that there is the following provision in the last will of Mrs. MacDonald:

"*FIRST*: I direct that all my just debts and funeral expenses be paid as soon after my decease as conveniently can be done; and I further direct that all estate, transfer, succession, inheritance, legacy, gift and similar taxes upon, or with respect to, any property required to be included in my gross estate for tax purposes under the provisions of any tax law, and whether or not passing hereunder or upon or with respect to any devises or bequests made herein, or upon or with respect to any such property, shall be paid out of my residuary estate here-

---

3. From the testimony of Mark Bobo, the plaintiff's grandfather; there is no direct refutation of this testimony in the record.

under as an expense in the settlement of my estate."

The appellants urge that the intent of the testatrix, Mrs.MacDonald, will be completely frustrated if this provision is given effect. The will in which this provision is contained divides Mrs. MacDonald's estate, after minor bequests, substantially equally between the nephew and the great grand-niece, who are the adversaries here.

The controlling provisions of these tax laws place the duty of paying the tax upon the personal representative of the decedent's estate, see 26 U.S.C.A. § 2002, and A.R.S. § 42–1526. Until the landmark decision of Riggs v. Del Drago, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942), it had been assumed by courts having the problem before it that the federal estate tax liability was payable out of the residue of the probate estate, see, e. g., In re Hamlin, 226 N.Y. 407, 124 N.E. 4, 7 A.L.R. 701 (1919), and Bemis v. Converse, 246 Mass. 131, 140 N.E. 686 (1923). In *Del Drago*, the New York Court of Appeals had held that a New York statute providing for apportionment of the tax among the recipients was an unconstitutional encroachment upon the powers of the federal government in that it violated pertinent provisions of the Internal Revenue Code. In re Del Drago's Estate, 287 N.Y. 61, 38 N.E.2d 131 (1941). On certiorari to the United States Supreme Court, this interpretation was rejected and the states were given free rein to legislate upon the final impact of the tax as to " * * * properties actually handled as part of the estate by the executor," 317 U.S. at 102, 63 S.Ct. at 112. Subsequent decisions have taken the *Riggs* decision to mean that the states may legislate upon the final impact of the tax which results from the inclusion of *non*-probate assets in the gross taxable estate, and, as a matter of fact, most courts adopting a rule of equitable apportionment have done so in cases involving only *non*-probate assets. See In re Glover's Estate, 45 Haw. 569, 371 P.2d 361, 372 (1962).

There is a clear split of authority in this country as to whether some form of equitable apportionment will be decreed in the absence of statute. See Annot., 37 A.L.R. 2d 169. According to a resume of the judicial decisions and statutory law in the fifty states, 16 DePaul L.Rev. 112 (1966), twenty-one states have adopted a rule of apportionment by statute, and thirteen by court decision without the aid of statute; eleven jurisdictions have rejected the doctrine, two by statute and nine by court decision, leaving five jurisdictions, where the issue has not been decided. A federal decision predicts that Arizona will adopt an equitable apportionment rule, Doetsch v. Doetsch, 312 F.2d 323 (7th Cir. 1963), and in the above-cited law review note, Arizona is included among the thirteen jurisdictions which have judicially adopted the doctrine. An opinion of our Attorney General concurs with the *Doetsch* prediction. Op. Att'y Gen. 8 (1967).

But no statute or court decision called to our attention has imposed an equitable apportionment in violation of the clear provisions of a will. We believe the following to be a correct statement:

"And it is universally held that a testator may shift the burden of death taxes to suit himself, that he may require that some or all beneficiaries bear a share of the tax, or, if the local statute or rule requires apportionment, that he may direct that the taxes shall not be apportioned." 37 A.L.R.2d at 170.

In re Gallagher's Will, 57 N.M. 112, 255 P.2d 317, 37 A.L.R.2d 149 (1953), is a decision relied upon by the appellants to persuade the judicial adoption by this court of an apportionment rule. However, this decision clearly recognizes that the apportionment rule is controlled by express provisions in the will:

"We are in accord with so much of the Washington opinion [In re Heringer's Estate, 38 Wash.2d 399, 230 P.2d 297 (1951)] as recognizes the testator may by provisions in his will direct the incidence of the burden of the federal

estate tax, and with their ruling he had in that case directed the tax attributable to the wife's share of the community property should not be paid by his residuary estate." 255 P.2d at 323.

■ ■ Tempted as we are to find an ambiguity in this will, we are unable to do so. The decision of In re Armstrong's Estate, 56 Cal.2d 796, 17 Cal.Rptr. 138, 366 P.2d 490 (1961), demonstrates great skill in finding an ambiguity in somewhat similar language.[4] But the grounds for finding uncertainty in *Armstrong* are lacking here. We have been cited no decision which comes as close as does *Armstrong* to giving authority to a court to disregard the direction of the testator as to the payment of estate taxes.[5] The controlling words in this will are so clear and precise that even the appellants have not been able to suggest how the intent to charge the residuary estate for all estate taxes could have been expressed in clearer language.[6]

■ ■ The subject provision indicates that the testatrix contemplated that she might make gifts, which would increase the estate taxes accruing on death. We agree that the intent of the testatrix is the overriding consideration, but the intent expressed in the will is controlling. Newhall v. McGill, 69 Ariz. 259, 262, 212 P.2d 764, 766 (1949); Estate of Baxter, 58 Ariz. 16, 20, 117 P.2d

91, 93 (1941); Lowell v. Lowell, 29 Ariz. 138, 142, 240 P. 280, 282 (1925); In re Estate of Daley, 6 Ariz.App. 443, 447, 433 P.2d 296, 300 (1967). It is very possible, though perhaps less than probable if we look away from the clear words of this will for our lodestar, that Mrs. MacDonald wanted her property to pass exactly as will be the case. We believe the following quotation from Bemis v. Converse, *supra*, to be singularly applicable:

"It is strongly argued that the intention of the settlor and testator cannot have been that the entire burden of a tax of this nature should fall upon his estate and the property held under the trust deed be completely exonerated. Courts cannot speculate concerning the intention of settlors and testators as to where they intend the burden of taxes to rest. The instrument as written must govern. Opportunity is freely open in framing trust deeds and wills to make full and accurate expression of desire and intention respecting the payment of taxes and the particular beneficiaries whose shares shall be exonerated from or bear that pecuniary exaction for the support of government. Specific provision on this point is familiar in wills and is not infrequently found in other instruments. In the absence of a definite declaration on the subject it must be presumed that the

4. The key language in *Armstrong* was: "I direct my executor or executrix to pay out of my *estate* all my just debts, funeral expenses, expenses administration, and all estate and inheritance taxes which may become due by my death, without limitation to property passing under my will." (Emphasis added) 17 Cal.Rptr. at 140, 366 P.2d at 492.
The California Supreme Court found the word "estate" to be ambiguous (17 Cal.Rptr. 138, 366 P.2d 494), inasmuch as the apportionment statute adopted in California, §§ 970 and 977, Probate Code, defined "estate" to mean " * * * all property included for Federal estate tax purposes in determining the Federal estate tax pursuant to the Federal estate tax law."

5. At the time of oral argument, the appellants cited Kapnek v. Kapnek, 38 N.J.

Super. 268, 118 A.2d 701 (1955), as being a case holding that when all of the probate assets will be exhausted by the testator's direction, the direction will be ignored by the court and the taxes apportioned. We do not construe that decision as do the appellants. In our view, this was a suit to recover the deficiency of estate taxes after the probate estate had been "exhausted" in their partial payment. (118 A.2d at 704.) No similar claim has been advanced here; the plaintiffs seek only a declaratory judgment that *all* estate taxes should be apportioned over *all* assets included in the gross taxable estate.

6. Ironically, the same firm of lawyers representing plaintiffs in this action prepared this will for Mrs. MacDonald.

intention was that the ultimate weight of taxation must rest where the law places it. It cannot be presumed that anything else was intended than what is stated in the written instrument. It may be, for aught that now can be known, that the precise result which has happened was intended. There is no jurisdiction in equity to prescribe what may seem fairer than the settlor or testator has declared. To do that is as foreign to chancery principles as to remold a will in order to make it conform to different conceptions of justice or fairness from those indulged by the testator." 140 N.E. at 687.

Judgment affirmed.

HATHAWAY and KRUCKER, JJ., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.