NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TOREN C., FAWN W., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, N.W., M.B., M.W., *Appellees*.

No. 1 CA-JV 21-0287
FILED 3-24-2022

Appeal from the Superior Court in Maricopa County
No.  JD532514
The Honorable Nicolas B. Hoskins, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Czop Law Firm PLLC, Higley
By Steven Czop
*Counsel for Appellant Toren C.*

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Fawn W.*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge James B. Morse Jr. joined.

H O W E, Judge:

¶1     Fawn W. ("Mother") appeals the juvenile court's order terminating her parental rights to M.B., M.W., and N.W. N.W.'s father, Toren C. ("Father"), also appeals the juvenile court's order terminating his parental rights to N.W.[1] For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2     We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). Mother has eight other children in addition to M.B., M.W., and N.W. She has a decade-long history with the Department, including two previous dependencies. This third dependency began in February 2019 when the Department received a report that she and her children were squatting in an apartment where the lease holders had been evicted. After the Department contacted Mother, she removed her children from school and would not allow them to return. Two months later, she used five of her children to shoplift merchandise, employing her fifteen-year-old, who did not have a driver's license, as a getaway driver. After her arrest, Mother absconded to Oregon where she gave birth to N.W. in May 2019. Oregon's child-safety agency returned the children to Arizona a month later, and the Department petitioned for dependency, placed the children in group and foster homes, and referred Mother for reunification services.

¶3     Mother did not consistently participate in services, was unsuccessfully closed out of most services, and continued her criminal activity. Less than a month after N.W. was returned to her care, Mother shoplifted again, concealing the stolen goods in N.W.'s stroller, and the Department removed N.W. from her care a second time. Even so, the Department returned her other children to her care, referring her to a Family Preservation Team to assist the transition. But she failed to engage

---

[1]     M.B.'s father and M.W.'s father are not parties to this appeal and their parental rights have been terminated.

with the team, did not send the children to school, and did not contact the service providers to help with her special needs children, including M.B.

¶4        In January 2021, while the children were present, Mother hosted a large party at her home. A shooting occurred during the party. After the incident, Mother hid both herself and her children from the Department. The Department later found them all in a hotel. The children were dirty and the newborn had developed a ringworm infection. The seven and five-year-old girls also said that they had been sleeping in a bed with a man they had known only a few days. The Department again removed the children from Mother's custody.

¶5        In March 2021, the Department contacted police during a supervised visit when Mother became aggressive with a visitation aide. In May 2021, the juvenile court ordered Mother to participate in hair-follicle testing, urinalysis, and counseling before visitation could resume. She did not complete any of the services, and her visits with her eight youngest children were discontinued. The Department also found that Mother had an active warrant for her arrest derived from another shoplifting incident in October 2020.

¶6        During this time, Father provided a paternity test in July 2019 establishing that he was N.W.'s father. The Department had concerns about Father's ability to parent based on his criminal history and because two of his other children had been adopted by his mother due to his inability to parent. The Department, therefore, placed N.W. in paternal grandmother's home in December 2019 and referred Father for supervised visitation services. Father refused to engage in services and the supervised visitation service was discontinued. The case manager explained to Father that the supervised visitation provided an opportunity for the Department to gather information about his ability to parent. Despite the case manager's instructions, Father also disregarded a second referral for supervised visitation services in early 2020. Father did not engage in any other services or request any services to help reunify with N.W.

¶7        In October 2020, the Department amended the dependency petition to allege that N.W. was also dependent regarding Father because of his failure to maintain a normal parent-child relationship and to provide for N.W.'s basic needs. When paternal grandmother passed away and the Department placed N.W. with a paternal aunt, Father ceased visiting N.W. soon after and did not respond to the Department's attempts to contact him. Father also failed to appear at the initial dependency hearing, and the juvenile court adjudicated N.W. dependent as to Father in January 2021.

Father first appeared at a status conference in March 2021 and objected to the case plan switching to termination and adoption.

¶8           In April, the Department moved to terminate Father's and Mother's parental rights to N.W. under the nine months in out-of-home placement grounds under A.R.S § 8–533(B)(8)(a) and the 15 months in out-of-home placement grounds under A.R.S § 8–533(B)(8)(c). It also moved to terminate Mother's parental rights to M.B. and M.W. under the 15 months in out-of-home placement grounds. The case manager again spoke to Father about the availability of reunification services, including parent-aide services and supervised visitation, and requested that he participate in a rule-out substance-abuse test. The next month, the Department sent Father a letter detailing the services available and asked him to provide documentation of stable housing and employment. Father did not engage in any of the services outlined in the letter. The Department again tried to contact Father in July 2021 to verify employment and housing, but he did not provide evidence of stable housing or employment.

¶9           The juvenile court held a termination trial in August 2021. The Department's current case manager testified that M.B., M.W., and N.W. were adoptable, and that termination was in their best interests. She said that although M.W. was not in an adoptive care, he would be readily adoptable once Mother's parental rights were terminated. She stated that although M.W. had been diagnosed with "disruptive mood dysregulation" disorder and had sometimes been aggressive in the past, he was no longer taking medications. Thus, she did not believe he had any behavioral concerns or issues that would hinder his likelihood of adoption in the future. She also testified that in June 2021, after a phone call from Mother, M.B. began to act out, requiring M.B.'s removal from the foster home for additional support for her behavioral and mental health. While the foster parents expressed concerns about M.B.'s behaviors, they remained involved with her and wanted to adopt her. She also testified that the children would suffer if Mother's rights were not terminated because they would more than likely be neglected, their needs would not be met, and their environment would not be consistent and stable, prohibiting their ability to thrive. Lastly, the case manager testified about the various attempts to get Father to engage in services, the various services provided throughout the dependency, and that Father did not engage in services nor did he respond to the Department's attempts to maintain contact.

¶10          Mother testified that separating the children from her would harm them. She said that they are good kids and that they deserve to be together and for that reason alone, being with her would be in their best

interests. Father testified that although he had multiple conversations with the case manager about why he needed to show up for the supervised visits, he admitted that he did not do so. He also said that he had visited N.W. only once since his mother had passed, a period of eight months, and that N.W. had bonded with the foster family. When asked why he stopped supporting N.W., he stated only that he did not want the support to be given to all the people staying with foster family and N.W.

¶11   The juvenile court terminated Mother's rights to M.B., M.W., and N.W. under the 15 months in out-of-home placement grounds. The juvenile court found that despite Mother's involvement with the Department, her ability to parent in 2021 was no better than it was in 2019 and that she would be unable to exercise proper and effective parental care and control in the near future. Regarding Father, it found that no service could teach him to expend the effort needed to become a safe parent. It concluded that Father was content with visiting N.W. but had no real intention to assume parenting responsibilities and that he had substantially neglected or willfully refused to remedy the circumstances that caused N.W. to be in out-of-home care.

¶12   The juvenile court then concluded that termination was in the children's best interests. It found the N.W. was in adoptive care and that he would benefit from the permanency that environment provided. As to M.B., the juvenile court found that she was likely adoptable and that she would suffer a detriment if Mother's rights were not terminated because Mother's inability to reunify in the foreseeable future left her in limbo and actively harmed her. As to M.W., the juvenile court found that he had never been in adoptive care but that the Department had provided persuasive testimony that it had more services available to find an adoptive match after termination. It also found that being in a constant place of limbo harmed M.W. Mother and Father timely appealed.

## DISCUSSION

### I. Father's Appeal

¶13   Father argues that the juvenile court erred in finding grounds for termination but does not otherwise challenge the juvenile court's finding that termination was in N.W.'s best interests. This court reviews a juvenile court's termination determination for an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004). Because the juvenile court is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts, *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004), we will

affirm a termination decision unless no reasonable evidence supports it, *Xavier R. v. Joseph R.*, 230 Ariz. 96, 100 ¶ 11 (App. 2012).

**¶14** To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one statutory ground under A.R.S. § 8−533. Ariz. R.P. Juv. Ct. 66(C); *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). A juvenile court may terminate parental rights when a child has been in an out-of-home care for a cumulative total period of at least nine months (or six months if the child is under three), the Department has made a diligent effort to provide appropriate reunification services, and the parent has substantially neglected or willfully refused to remedy the circumstances that caused the dependency. A.R.S § 8–533(B)(8)(a). The Department satisfies its diligent-efforts obligation if it provides the parent with "the time and opportunity to participate in programs designed to help [him] become an effective parent." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). When a party makes only sporadic, aborted attempts to remedy the circumstances that caused the child's to be in out-of-home care, a juvenile court "is well within its discretion in finding substantial neglect and terminating parental rights on that basis." *In re Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 576 (App. 1994).

**¶15** The Department made diligent efforts to provide reunification services, but Father willfully refused to participate in the services. The Department offered him parent-aide referrals and supervised visitations beginning in 2019 that were all discontinued because of non-compliance. Indeed, Father testified that the case manager explained to him the importance of participating in supervised visitations when N.W. was at paternal grandmother's in 2020, but that he made no effort to engage in the service and did not explain his failure. Despite the Department's efforts, Father did not engage in any service the Department provided. As the juvenile court aptly noted, no service the Department offers can teach a parent to expend more effort.

**¶16** Father argues that the juvenile court erred in terminating his parental rights only eight months after being named in the dependency, violating A.R.S § 8–533(B)(8)(a) and his due process rights. This court reviews issues of statutory interpretation de novo. *See, e.g.*, *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 440 ¶ 12 (App. 2014). This court interprets statutes to give effect to the legislature's intent, looking first to the statutory language itself. *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383 ¶ 8 (2013).

¶17 Under A.R.S. § 8–533(B)(8)(a), a juvenile court may terminate parental rights when a child has been "in an out-of-home placement for a cumulative total period" of at least nine months. The statute does not mention, much less require, that a parent be a named party to the dependency proceeding throughout the nine months the child is in care. *See* A.R.S. § 8–533(B)(8)(a). Rather, the statute obliges the Department to work with the parent toward a goal of reunification throughout the statutory period. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 49 (App. 2019). Similarly, due process requires only that the parent receive fair notice of the out-of-home care and an opportunity to reunify with the child. *See Cravens, Dargan & Co. v. Superior Ct. In & For Pima Cnty.*, 153 Ariz. 474, 476 (1987). Father knew that he was N.W.'s father and that N.W. was in out-of-home care in 2019, thereby having notice. To allow a parent to sit back during a dependency and delay a finding of paternity to circumvent the time in care analysis would be at odds with the goal of achieving permanency for a child.

¶18 Father next argues that the Department's alleged intermittent efforts and large gaps in services do not satisfy the diligent efforts requirement. First, the record shows that the gaps in services were largely due to the Department's inability to get in contact with Father. Indeed, throughout the dependency, the Department provided Father with supervised visitation, paternity testing, rule-out drug screening, a parent-aide, and transportation services, providing Father with time and opportunity to engage in services. Second, Father did not engage in the services provided by the Department. Because the Department is only required to "undertake measures with a reasonable prospect of success[,]" *see Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶ 36 (App. 1999), Father needed to engage in some of the Department's offerings lest additional services be considered futile, *see Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235 ¶ 15 (App. 2011); *see also Mary Lou C.*, 207 Ariz. at 50 ¶ 17 (stating that if the juvenile court does not expressly make a necessary finding, this court may examine the record to determine whether the facts support the implicit finding).

¶19 Father further argues that his lack of counsel in 2019 and 2020 affected his engagement and thus the Department's diligence. But Father does not state how the presence of counsel would have changed his behavior. In fact, since Father has had counsel, he has continuously failed to engage in services and his own testimony shows that he has visited N.W. only once since paternal grandmother's death. The juvenile court therefore did not err in terminating Father's parental rights under the nine-months in out-of-home placement grounds. A.R.S. § 8–533(B)(8)(a).

## II.    Mother's Appeal

**¶20**        Mother does not challenge the juvenile court's finding that the statutory grounds for termination existed. Rather, Mother argues that the juvenile court erred because termination was not in the children's best interests. This court reviews a juvenile court's best-interests determination for an abuse of discretion. *Mary Lou C.*, 207 Ariz. at 47 ¶ 8.

**¶21**        Once the juvenile court finds grounds for termination, it must determine whether termination of the parent-child relationship is in the children's best interests by a preponderance of the evidence. A.R.S. § 8–533(A). The Department can establish best interests by showing either that the child will benefit from termination of the relationship or that the child would be harmed by continuing the parental relationship. *Oscar O.*, 209 Ariz. at 334 ¶ 6. Relevant factors include whether the current foster home is meeting the child's needs, an adoption plan is in place, and the child is adoptable. *Demetrius L.*, 239 Ariz. at 3–4 ¶ 12. The juvenile court may find that continuing parent-child relationship would be detrimental to the child's wellbeing because the child would linger in care with no prospect of reunifying with the parent. *See Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 571–72 ¶¶ 6, 10 (App. 2018). The juvenile court presumes that the interests of the parent and child have diverged once one of the statutory grounds for termination has been proved. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 12 (2018).

**¶22**        Reasonable evidence supports a conclusion that continuing the parent-child relationship would be detrimental to all three children. Mother has continuously disregarded her children's education and physical health. Despite M.B.'s special needs, Mother would not attend meetings that addressed her needs and would not respond to behavioral health service providers. Indeed, after interacting with Mother, M.B.'s mental health declined and the Department had to remove M.B. from her foster family to receive additional care.

**¶23**        Mother has also directly endangered her children in the past, including hosting a party in which a shooting occurred. Despite the pending dependency, Mother engaged in repeated criminality with the children, utilizing them in her shoplifting schemes. Mother remains far from being able to properly care for M.B., M.W., and N.W., subjecting them to long-term instability with no prospect of reunifying with her, a clear detriment to the children's bests interests. *Aleise H.*, 245 Ariz. at 571–72 ¶¶ 6, 10; *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350 ¶ 23 (App.

2013) ("[T]he continued presence of the conceded statutory grounds for [termination] also may, in certain cases, negatively affect the children.").

¶24        Alternatively, reasonable evidence supports the trial court's conclusion that the children would benefit from the termination of Mother's parental rights. N.W. was in adoptive care, had formed strong bonds with his foster family, and his foster family was providing for his needs. While the Department recently removed M.B. from her adoptive foster family, the family still desired to adopt her and had otherwise provided for her needs. Although M.W. is not currently in adoptive care, the Department has more resources to find adoptive care for M.W. once he is available for adoption. *See Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98 ¶ 11 (App. 2016) (stating that "adoptable" status despite no adoptive plan is a benefit that may, in consideration with other factors, support the "best interests" finding). Although evidence suggests that M.W. had been disruptive in the past, reasonable evidence supports the trial court's conclusion that his behavior has improved and that he was adoptable. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002) (this court will not reweigh evidence).

¶25        Mother argues, however, that the juvenile court did not consider the totality of the circumstances, particularly the familial bond between the children in finding termination in their best interests. This court presumes that the juvenile court properly applied the law absent evidence to the contrary. *See Hart v. Hart*, 220 Ariz. 183, 188 ¶ 18 (App. 2009) (appellate courts presume the trial court knows the law and applies it correctly); *see also Brewer v. Peterson*, 9 Ariz. App. 455, 458 (1969) ("The . . . appellate court must assume that the [trial] court did no wrong, in the absence of a showing to the contrary."). The juvenile court specifically addressed M.W.'s relationship with his sister, however, and still determined both that termination would benefit him and that continuing the parent-child relationship would be a detriment. Although, the juvenile court did not specifically address M.B.'s siblings in finding termination in her best interests, this court presumes that the juvenile court considered the factor, especially considering that it did so with M.W. *See Fuentes v. Fuentes*, 209 Ariz. 51, 55–56 ¶ 18 (App. 2004) (noting that appellate court presumed trial court had considered relevant factors, even though it did not "specifically detail" them in its ruling).

¶26        Mother next argues that she shares a strong bond with the children, and that termination is therefore not in their best interests. The existence and effect of a bonded relationship between a parent and a child, although a factor to consider, is not dispositive in addressing best interests.

*Dominique M.*, 240 Ariz. at 98 ¶ 12. Even so, the juvenile court did address the children's bond with their Mother and found that termination was in their best interests. Mother points to no other parts of the record in support of her contention and has therefore failed to prove the juvenile court did not consider the totality of the circumstances. *Hart*, 220 Ariz. at 188 ¶ 18. The juvenile court therefore did not err in terminating Father's parental rights under the 15 months in out-of-home placement grounds. A.R.S. § 8–533(B)(8)(c).

**CONCLUSION**

¶27        For the reasons stated, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:          JT